JAVITCH LAW OFFICE
MARK L. JAVITCH (State Bar No. 323729)
*mark@javitchlawoffice.com*
3 East 3rd Ave. Ste. 200
Telephone: (650) 781-8000
Facsimile: (650) 648-0705

Attorney for Plaintiff and Class Members

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONEN HELMANN, on behalf of all others similarly situated, and, <br><br> Plaintiff, <br><br> v. <br><br> CODEPINK WOMEN FOR PEACE, a California entity; CODEPINK ACTION FUND, a California entity; COURTNEY LENNA SCHIRF; REMO IBRAHIM aka REMO ABBOUD; PALESTINIAN YOUTH MOVEMENT; and DOES #1-100, <br><br> Defendants. | Case No.: 2:24cv5704 <br><br><br><br> **THIRD AMENDED CLASS ACTION COMPLAINT** |

1

1

## **INTRODUCTION**

2

1.     Bear-sprayed  congregants.  Jews  assaulted,  intimidated,  and

3

threatened. Bloodied members of the Jewish community who wished only to

4

5

exercise their First Amendment right of religious freedom at a place of worship.

6

2.     The images that emerged from the antisemitic riot outside the Adas

7

Torah Synagogue (the "Synagogue") on June 23, 2024, shock the conscience.

8

9

3.     But even in 2024, in the United States, those images are no longer

10

surprising.

11

4.     Instead, they are emblematic of an increasingly common occurrence:

12

13

organized riots that violently target the American Jewish community.

14

5.     On June 23, 2024, the Named Defendants (all Defendants, excluding

15

Does #1-100) incited scores of individuals (including Does #1-100) to terrorize

16

17

Jewish congregants outside their Synagogue.

18

6.     The rioters blocked access for some congregants, trapped others inside,

19

20

and attempted to intimidate all of them.

21

7.     Outside, some in the mob (including Does #1-100) bear sprayed and

22

attacked Jewish congregants and others present.

23

24

8.     The attack was organized, publicized, aided, and (on information and

25

belief) funded by Defendants CodePink Women for Peace and Palestinian Youth

26

27

2

28

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

Movement ("PYM") (two organizations that seek to destroy the Jewish State of Israel), as well as by Defendant Courtney Lenna Schirf (a PYM organizer) and Defendant Remo Ibrahim (an organizer for PYM's local chapter).

9.     As a result, a violent mob, including Does #1-100, used violence, intimidation, and threats to prevent Jewish people from accessing the Synagogue.

10.     This violence forcibly halted at least one prayer service and multiple religious study sessions.

11.     Plaintiff Helmann, for instance, tried to enter the Synagogue through the front entrance, but he was blocked by the angry mob, most of whom donned matching keffiyehs to hide their identities.

12.     The rioters stood shoulder-to-shoulder, screeching antisemitic slurs and brandishing weapons.

13.     After facing the angry mob, Helmann was unable to enter the synagogue safely, so he decided to return home.

14.     Defendants' violent riot also prevented a number of individuals, including members the Proposed Class, from attending an event that was supposed to involve prayer and educate Jewish congregants about housing opportunities in Israel, which would fulfill their religious commandment to emigrate to Israel.

15.     Upon seeing or being notified of Defendants' riot, other members of

3

the Proposed Class were intimidated from even approaching the Synagogue and were effectively forced from exercising their First Amendment right of religious freedom out of fear for their physical safety, since passage to and from the Synagogue was rendered unreasonably difficult or hazardous.

16.     These hazards arose not only from the physical blockade, but also from the decision of the rioters to brandish weapons and perpetuate violence, all while spewing racial and antisemitic slurs.

17.     Years ago, Congress recognized that this type of conduct is repugnant.

18.     Accordingly, it created a statutory mechanism to hold accountable those who prevent individuals from exercising their First Amendment right of religious freedom.

19.     Specifically, the Freedom of Access to Clinic Entrances Act (the "FACE Act"), 18 U.S.C. § 248, ensures that individuals may practice their respective religions free from persecution, interference, and intimidation.

20.     Having violated this statutes, Defendants are liable for damages (including punitive damages), and Plaintiff and the putative class are entitled to injunctive relief to prevent Defendants from again perpetuating similar transgressions.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

## JURISDICTION AND VENUE

21.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under acts of Congress.

22.    This action arises because Defendants deprived Plaintiff Helmann and the Proposed Class Members of their rights under the FACE Act, 18 U.S.C. § 248, which prohibits the actual or attempted physical obstruction, intentional injury, intimidation, or interference with any person lawfully exercising their First Amendment right of religious freedom. *Id.* § 248(a)(2).

23.    For purposes of the FACE Act, the term "physical obstruction" not only means rendering impassable ingress to or egress from a place of religious worship, but also expressly covers situations in which passage to or from a place of religious worship was rendered unreasonably difficult or hazardous, even if a FACE Act plaintiff eventually succeeded in entering or exiting a place of religious worship. *Id.* § 248(e)(4).

24.    The FACE Act also provides civil remedies and a cause of action for "[a]ny person aggrieved by reason of the conduct prohibited by subsection (a)." *Id.* § 248(c)(1)(A).

25.    Named Defendants also deprived Plaintiffs of their civil rights,

5

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

protected by 42 U.S.C. § 1985(c), which provides that any "party so injured or deprived" of their civil rights by virtue of a conspiracy "may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

26.    Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiff Helmann's and Proposed Class Members' claims occurred in the Pico-Robertson neighborhood of Los Angeles, California, which is in this District.

## **PARTIES**

### **A.    The Plaintiff and Proposed Class**

27.    Plaintiff Ronen Helmann is a resident of the Pico-Robertson neighborhood of Los Angeles, California, and is the named representative for the Proposed Class.

### **B.    The Defendants Who Organized the Riot.**

28.    Defendant CodePink Women for Peace ("CodePink") is a registered California entity and a Section 501(c)(3) non-profit organization that supports the terrorist organization Hamas and opposes the State of Israel.

29.    CodePink is headquartered in Marina Del Rey, California.

30.    CodePink describes itself as a "feminist grassroots organization

6

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

working to end U.S. warfare and imperialism, support peace and human rights initiatives, and redirect resources into healthcare, education, green jobs and other life-affirming[] programs."[1]

31.     Contrary to that description, CodePink has long supported terrorists and terrorist entities, including Iran, the largest state-sponsor of terror; Ansar Allah (also known as the "Houthis"),[2] which was previously designated a Foreign Terrorist Organization; and Hamas.[3]

32.     Each of these terrorist entities has called for the annihilation of the Jewish people.

33.     Members of CodePink have attended a conference in Iran with Holocaust deniers, and they have met with Hamas officials "several times."[4]

_____

[1] *What is CODEPINK?*, CODEPINK, https://www.codepink.org/about (last visited Dec. 18, 2024).

[2] Haley Strac, *Another Defense of Terrorism from Code Pink*, NAT'L REVIEW (Jan. 16, 2024), https://www.nationalreview.com/corner/another-defense-of-terrorism-from-code-pink/.

[3] CODEPINK Staff, *CODEPINK Women Travel To Gaza TODAY To Witness Damage And Demand A Lifting Of The Blockade; Plan To Meet With Women's Groups, Hamas Officials*, CODEPINK (Jan. 29, 2009), https://www.codepink.org/official_release_codepink_women_travel_to_gaza_today_to_witness_damage_and_demand_a_lifting_of_the_blockade_plan_to_meet_with_women_s_groups_hamas_officials.

[4] James Reinl, *Hard-Left Activists Code Pink's History Of Israel-Bashing Revealed: Anti-War Feminist Group That's Under Congressional Scrutiny Over Ties To Chinese Communist Party Has A Record Of Links To Iran, Hamas And*

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

7

34.   Upon information and belief, members of CodePink were among those who physically obstructed Plaintiff Helmann and Proposed Class Members from accessing the Synagogue on June 23, 2024.

35.   Defendant CodePink Action Fund ("CodePink Fund") is a registered California entity and Section 501(c)(4) non-profit organization that works hand-in-glove with CodePink.

36.   CodePink Fund shares a headquarters and leadership with CodePink.

37.   Defendant PYM, including local chapters such as PYM for Los Angeles, Orange County, and the Inland Empire ("PYM LA-OC-IE"), is an unincorporated association without a formal principal place of business or publicly identified leadership structure.

38.   Defendant Courtney Lenna Schirf is a PYM organizer.

39.   Defendant Remo Ibrahim is an organizer for PYM's local chapter.

40.   Nominally, PYM is an anti-Israel movement established to advocate for Palestinian liberation.

---

*'Antisemitism'*, DAILY MAIL (Dec. 23, 2023, 7:11 AM), https://www.dailymail.co.uk/news/article-12797043/Codepink-antisemitic-left-war-congress-Iran-Hamas-Israel.html.

8

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

41.    But in reality, PYM justifies terror attacks against Jews and has expressed public support for members of U.S.-designated Foreign Terrorist Organizations.

42.    PYM's latest campaign of terrorizing Jews outside the Synagogue mirrors its previous activities.

43.    For instance, PYM recently helped organize a conference, titled the People's Conference for Palestine (the "Conference"), which involved multiple speakers who are affiliated with Foreign Terrorist Organizations.

44.    One such speaker was Sana Daqqah, the Conference's keynote speaker and wife of Walid Daqqah, a Popular Front for the Liberation of Palestine terrorist convicted of the kidnapping, torture, and murder of Israeli Moshe Tamam.[5]

45.    One PYM organizer at the Conference, Sarah Abdelshamy, celebrated the terror attacks of October 7, 2023, while speaking on a panel: "In the past eight months, we've seen incredible images of victory—from witnessing the families of political prisoners reunite with, and embrace their loved ones for the first time in

---

[5] Michael Starr, *Rashida Tlaib attends conference honoring terrorists, hosting terrorist speaker*, JERUSALEM POST (May 26, 2024), https://www.jpost.com/international/article-803703.

9

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

years—to scenes of our heroic people breaking down the siege that has suffocated the Gaza Strip for 17 years."[6]

46.    PYM often collaborates with the organization National Students for Justice in Palestine ("NSJP"), which is being sued in the wake of the October 7 attacks in the U.S. District Court for the Eastern District of Virginia for providing material support to Hamas and other Foreign Terrorist Organizations.[7]

47.    Upon information and belief, members of PYM were among those who blocked Plaintiff Helmann and Proposed Class Members from accessing the Synagogue on June 23, 2024.

48.    PYM has historically operated as a fiscal sponsorship of WESPAC, meaning that WESPAC has collected and disbursed donations on PYM's behalf because PYM lacks tax-exempt status.[8] *See infra* ¶¶ 96-154.

---

[6] *Id.*

[7] *See* Complaint for Damages and Jury Trial Demand, *Parizer v. AJP Educational Foundation Inc.*, No. 1:24cv724 (E.D. Va.).

[8] *Palestinian Youth Movement Profile*, NGO MONITOR (June 2, 2024), https://www.ngo-monitor.org/ngos/palestinian-youth-movement/#:~:text=WESPAC%20Foundation%20serves%20as%20the,amounts%20disbursed%20for%20PYM%20activities.

10

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

49.     CodePink and PYM are fully aware that their protests often result in violence, arrests, and unlawful disruptions of government proceedings, roads, bridges, and city streets.

50.     In fact, their organizers openly state that disruption is their goal.

51.     As a result, these protests go beyond protected First Amendment activity; they are deliberate actions that flout the law and violate the rights of others, regularly leading to violence, intimidation, and arrests.

52.     Even after the violent events at Adas Torah, these organizations have continued to engage in disruptive behavior.

**CODEPINK**

53.     Given their propensity for violence and chaos, CodePink protests commonly require protested entities to undertake additional security measures.

54.     For example, CodePink's June 7, 2024, protests at the White House "prompt[ed] additional security measures, including anti-scale fencing."[9]

55.     In May 2019, CodePink protesters occupied the Venezuelan embassy and engaged in "confrontation with actual Venezuelans."[10]

---

[9] Kanishka Singh, *Pro-Palestinian Protesters to Surround White House; Fencing Put Up*, *Reuters* (June 7, 2024), https://www.reuters.com/world/us/anti-war-activists-surround-white-house-protest-fencing-put-up-2024-06-07/.

[10] Petula Dvorak, *Code Pink Used the Venezuelan Embassy as an Anti-Trump Prop. Now the Show is Over*, *Washington Post* (May 16, 2019),

11

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

56.    In May 2023, a protest over a Ukraine book tour involving CodePink members turned violent, and CodePink was forced to condemn the violent protesters.[11]

57.    In July 2023, CodePink co-founder Jodie Evans was arrested for blocking the entrance to the U.S. Department of Justice.[12]

58.    In October 2023, CodePink boasted about its members being arrested for disrupting a Senate Appropriations Committee hearing.[13]

59.    In March 2024, a CodePink organizer was charged with felony vandalism after vandalizing Representative Nancy Pelosi's home.

60.    Rather than condemning the CodePink organizer, CodePink issued a press release condemning Representative Pelosi.[14]

---

https://www.washingtonpost.com/local/code-pink-used-the-venezuelan-embassy-as-an-anti-trump-prop-now-the-show-is-over/2019/05/16/9afe470c-77dd-11e9-b3f5-5673edf2d127_story.html.

[11] Code Pink, *CodePink Condemns the Violent Protesters at Medea Benjamin's Ukraine Book Tour Event in Minneapolis* (May 22, 2023), https://www.CodePink.org/statementonviolentattack.

[12] Code Pink, *CodePink's Co-Founder and Ben & Jerry's Co-Founder Arrested for Blocking DOJ Entrance While Protesting US Government's Prosecution of Wikileaks Publisher Julian Assange* (July 6, 2023), https://www.CodePink.org/dojarrest.

[13] Code Pink, *Several CodePink Peace Activists Demanding a Ceasefire NOW in Gaza in Senate Hearing Arrested* (Oct. 31, 2023), https://www.CodePink.org/arrestedforceasefirenow.

[14] Code Pink, *San Francisco CodePink Organizer Booked on Felony*

12

61.     In March 2024, CodePink members disrupted an event at University of California-Berkeley featuring Chancellor Carol Christ and former Secretary of State Condoleezza Rice.[15]

62.     In April 2024, CodePink members berated Defense Secretary Lloyd Austin outside of a hearing for the House Appropriations Subcommittee on Defense, leading to the arrest of a CodePink member.[16]

63.     In June 2024, CodePink boasted about the arrest of its members for disrupting Kamala Harris's appearance on *Jimmy Kimmel Live* during live taping.[17]

64.     In July 2024, a member of CodePink assaulted Congressman Derrick Van Orden during a CodePink protest at the Republican National Convention.[18]

---

*Charges of "Vandalism" of Nancy Pelosi's Home* (Mar. 22, 2024), https://www.CodePink.org/cynthiadetained.

[15] Code Pink, *UC Berkeley Alumni and Students Disrupt Chancellor Carol Christ and Former Secretary of State Condoleezza Rice Event on Free Speech* (Apr. 2, 2024), https://www.CodePink.org/condoleezaberkley.

[16] Louis Casiano, *Code Pink Activist Disrupts Defense Secretary Austin Hearing; 'You Have Blood on Your Hands', Fox News* (Apr. 17, 2024), https://www.foxnews.com/politics/code-pink-activist-disrupts-defense-secretary-austin-hearing-you-have-blood-your-hands.

[17] Code Pink, *Peace Activists Assaulted and Forcibly Removed From Jimmy Kimmel Live Taping With Vice President Kamala Harris* (June 5, 2024), https://www.CodePink.org/kimmelkamaladisrupt.

[18] Lawrence Andrea, Rep. Derrick Van Orden Accuses Code Pink Anti-War Protester of Assault During RNC, Milwaukee Journal Sentinel (July 16, 2024), https://www.jsonline.com/story/news/politics/2024/07/16/derrick-van-orden-

13

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

65.     In a statement posted on X, Congressman Van Orden wrote: "While standing in line to enter an event at the RNC today, I was assaulted by what appeared to be a member of the pro-Hamas group CodePink. A nearby police officer witnessed this assault and I understand they have been arrested."[19]

66.     In November 2024, CodePink operatives masqueraded as synagogue congregants and harassed CNN anchor Dana Bash while she was there to worship.

67.     Speaking about the event, Bash stated: "You came to a place of Jewish worship, stood on the Bhima, near the holy Torah scroll, and pretended to be congregants. You have no shame, no decency, and no clue what you're talking about."[20]

68.     After harassing Ms. Bash while she was attending religious services at her synagogue, CodePink bragged about having "confronted" her for the way she covers Code Pink's protests on CNN.[21]

---

accuses-code-pink-protester-of-assault-during-rnc/74433544007/.

[19] Derrick Van Orden, *Tweet* (Jul. 16, 2024), https://x.com/derrickvanorden/status/1813339483015668095. CodePink later confirmed it was their Palestinian campaign organizer.

[20] Jon Levine, *Dana Bash Slams Anti-Israel Protester Who Confronted Her at Synagogue*, New York Post (Nov. 16, 2024), https://nypost.com/2024/11/16/media/dana-bash-slams-anti-israel-protester-who-confronted-her-at-synagogue/.

[21] Code Pink, Tweet (Nov. 15, 2024) https://x.com/codepink/status /1857581013737603516

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

69.     And earlier this month, CodePink boasted about having "19 Students and Community Members Arrested at University of Wisconsin Board of Regents Meeting" for disrupting the Board's official proceedings.[22]

## PALESTINIAN YOUTH MOVEMENT

70.     PYM engages in the same disruptive, violent behavior.

71.     In November 2023, PYM sponsored "Shut It Down for Palestine" protests across the Country, seeking to disrupt business and services nationwide.[23]

72.     In January 2024, PYM also played a central role in organizing and leading a large-scale protest across New York City that blocked important traffic routes during rush hour, including the Brooklyn Bridge, Manhattan Bridge, Williamsburg Bridge, and the Holland Tunnel.[24]

73.     The protests included over 1,000 protesters.

---

[22] Code Pink, *19 Students and Community Members Arrested at University of Wisconsin Board of Regents Meeting* (Dec. 5, 2024), https://www.CodePink.org/uwregentsboardaction.

[23] Faygie Holt, *'Shut It Down for Palestine' Protests Planned for Cities Across America on Nov. 9*, *JNS* (Nov. 8, 2023), https://www.jns.org/shut-it-down-for-palestine-protests-planned-for-cities-across-america-on-nov-9/.

[24] Alaa Elassar & Emma Tucker, *At Least 320 Pro-Palestinian Protesters Arrested After Blocking Traffic Across New York City Bridges to Demand Gaza Ceasefire*, CNN (Jan. 8, 2024, 8:35 PM), https://www.cnn.com/2024/01/08/us/palestine-protest-nyc-gaza-ceasefire/index.html.

15

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

74.     Jamil Madbak, a PYM organizer, stated: "Our aim today was to clog the arteries of New York City to draw attention to the ongoing genocide of the Palestinian people and the people of Gaza."[25]

75.     In February 2024, about twenty protesters from PYM blocked traffic on the Golden Gate Bridge in San Francisco, according to the California Highway Patrol.

76.     In a press release, PYM acknowledged that its members blocked the traffic.[26]

77.     In March 2024, PYM played a central role in organizing a mass protest in downtown Los Angeles, where thousands of demonstrators blocked Spring Street.[27]

---

[25] *Id.*

[26] Evan Symon, *Palestinian Youth Movement Protest Stops Traffic On Golden Gate Bridge*, CALIFORNIA GLOBE (Feb. 14, 2024), https://californiaglobe.com/fr/palestinian-youth-movement-protest-stops-traffic-on-golden-gate-bridge/.

[27] Karla Rendon & Anastassia Olmos, *Thousands of Pro-Palestine Protesters Block Downtown LA Streets to Call for Ceasefire*, NBC Los Angeles (Mar. 2, 2024, updated Mar. 3, 2024, 4:27 PM), https://www.nbclosangeles.com/news/local/thousands-of-pro-palestine-protesters-block-downtown-la-streets-to-call-for-ceasefire/3353517/.

16

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

78.    Five arrests were made, and the event caused significant traffic disruption in one of the city's busiest areas.[28]

79.    Defendant Courtney Lenna Schirf ("Schirf") is a lead organizer for PYM.

80.    Schirf is a resident of Austin, Texas, and controls PYM's social media profiles.

81.    Defendant Remo Ibrahim aka Remo Aboud ("Ibrahim") is the head of the local chapter of PYM for Los Angeles, Orange County, and the Inland Empire.

82.    Ibrahim is a resident of Mission Viejo, California.

83.    Ibrahim has control over the local chapter of PYM's social media profiles.

84.    Does #1-100 are individuals who rioted in front of the Synagogue, thereby interfering with the ability of Plaintiff Helmann's and Proposed Class Members' ability to exercise their First Amendment right of religious worship at the Synagogue.

85.    Collectively, Defendants used antisemitic and bigoted incitement, intimidation, and violence to physically obstruct access to and from the Synagogue, thus rendering passage to or from the Synagogue unreasonably difficult or

---

[28] *Id.*

17

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

hazardous.

## COMMON FACTUAL ALLEGATIONS

### A.    Daily Religious Activity at Adas Torah.

86.    It is impossible to appreciate the impact of the riot on Plaintiffs—and the greater Jewish community—without appropriate context and an understanding of the importance of the following to Jews: gathering together; daily prayer; and *Aliyah*, the act of returning to dwell in Israel.

87.    First, the simple act of congregating, whether at a synagogue or elsewhere (and regardless of the motivation or reason for doing so), is part and parcel of Jewish religious practice dating back to the gathering at Mount Sinai at the dawn of Jewish history.

88.    Gathering together is an important part of religious worship and practice because, among other things, it: (1) helps the Jewish community feel a sense of awe and appreciation for being part of something transcendent; (2) fosters relationships and enhances solidarity within the community; (3) provides religious strength and confidence in numbers during trying times for the faith; (4) provides the opportunity to connect with loved ones and to connect with God; and (5) allows members of the faith to be "counted" together as God's people.[29]

_____

[29] *See* Proverbs 14:28; Babylon Talmud Berachot 53a; Mishna (Rosh

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

89.     Jewish law and custom reinforce the religious concept and importance of gathering in numerous ways.

90.     For example, certain prayers or religious rituals can only take place in the presence of a *minyan*.

91.     In the Orthodox Jewish faith, a *minyan* is a quorum of ten adult men.

92.     This quorum is so important that prayer services are referred to as a *minyan*.

93.     The importance of gathering and, in turn, the *minyan*, have a tremendous impact on another religious concept or requirement relevant here: daily prayer.

94.     The Talmud, the primary source of Jewish religious law, instructs that Jewish men and women should pray daily.

95.     In Orthodox Judaism, at least three prayer services are recited daily— Monday through Sunday, rain or shine, regardless of whether a particular day qualifies as a religious or secular holiday.

96.     The daily prayer services are the following: the morning prayer, or *shacharit*, which is recited at or about dawn; the afternoon prayer, or *mincha*, which

---

Hashanah 4:8); Babylon Talmud Rosh Hashanah 32b.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

is recited in the middle of the secular day; and the evening prayer, or *maariv*, which is generally recited at or about dusk.

97.    These daily prayer services may be supplemented by additional prayer services recited on the Jewish sabbath and on holidays.

98.    Each prayer service includes well-defined rituals and comprises specifically identified prayers, which are determined by Jewish law and custom.

99.    Certain of these rituals and prayers, however, cannot occur unless a *minyan* is present.

100.    These rituals and prayers typically occur in synagogues like Adas Torah.

101.    These include, but are not limited to, *Kaddish*, *Barchu*, *Kedusha*, and the repetition of the *Amidah*.[30]

102.    Given the importance of daily prayer, and gathering generally, many in the Orthodox Jewish community believe that daily prayer as part of a *minyan* is not only laudable, but it also amounts to a religious commandment—known as a *mitzvah*.

---

[30] *See*, *e.g.*, Mishna (Megillah 4:3).

20

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

103.   Because of the importance of daily prayer as part of a *minyan*, many Orthodox Jewish houses of worship—including the Synagogue—host at least three daily communal prayer meetings—*minyanim*.

104.   These daily *minyanim* may or may not be publicized on a communal calendar and occur daily regardless of whether they are advertised on a communal calendar.

105.   Nevertheless, they occur like clockwork, with worshippers regularly and reliably appearing in the morning, at or about noon, and at or about dusk, to pray together.

106.   The importance of gathering for prayer and other reasons also dovetails with the concept of *Aliyah*.

107.   *Aliyah* is a Hebrew word that, when translated directly into English, means "rise" or "ascent."

108.   Its meaning to Jews, however, extends beyond that literal translation.

109.   Instead, *Aliyah*, as a religious concept, has a far deeper meaning.

110.   It is the return to and gathering of the Jews in their ancestral homeland—Israel.

111.   The importance of *Aliyah* and its role as a predominant aspect of the Jewish faith date back millennia.

21

112.    The term is used in the Torah to describe the return of Jacob's bones from Egypt to the Land of Israel.[31]

113.    The Talmud explains that Judaism includes a religious commandment—a *mitzvah*—to buy land in Israel and to dwell there.[32]

114.    In fact, the Talmud makes clear that the religious commandment to make *Aliyah*, which specifically includes buying a home in Israel, "is equivalent to all of the other commandments in the Torah."[33]

115.    Indeed, the specific commandment to buy a home in Israel and to dwell there is so special that some Jewish scholars believe it overrides other commandments.[34]

116.    The *mitzvah* of *Aliyah* is so important that it merits its own discussions in the Talmud and other rabbinic texts.[35]

---

[31] *See* Genesis 50:13.

[32] *See, e.g.*, Babylonian Talmud, Ketubot 110b; Numbers 33:53; Deuteronomy 11:31.

[33] *See, e.g.*, Babylonian Talmud Gittin 8b; Sifrei, Re'eh, 53.

[34] *See* Babylonian Talmud, Bava Kamma 80b.

[35] *See, e.g.*, Babylonian Talmud, Gittin 8b, Shulchan Aruch (Code of Jewish Law), Orach Chayim 306:11.

22

117.   And (as with other *mitzvot*) the preparations to make *Aliyah*—i.e., preparing to return to and dwell in Israel—are also considered at least a partial fulfillment of the *mitzvah* of *Aliyah*.[36]

118.   In other words, simply educating oneself about the process of returning to Israel, the options for buying a house there, and other related acts fulfill a separate religious obligation.[37]

119.   While not all Jews adhere to the above concepts and beliefs, they are common and widespread, particularly among members of the Orthodox Jewish community.

120.   For Plaintiffs (as well as many other members of the Orthodox Jewish community), gathering together, daily prayer, and *Aliyah* are the outward manifestation of deeply held religious beliefs.

121.   They represent central tenets of the Jewish religion, and interference with any one of them amounts to interference with Jewish religious practice and expression.

---

[36] *See* Peninei Halakha, Shabbat 9:12 (citing Ramban (Nachmanides) on Babylonian Talmud Shabbat 130b); Rivash §387; *see also* Artzot Ha'Chaim, p. 2 (discussing how every step on the way is a separate fulfillment of a commandment).

[37] *See id.*

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

### B. The Synagogue and the Surrounding Pico-Robertson Neighborhood.

122. The Synagogue is an Orthodox Jewish house of worship located in Los Angeles's Pico-Robertson neighborhood.

123. The Synagogue offers the Jewish community in general—and the Pico-Robertson Jewish community, in particular—with multiple daily *minyanim*, Torah and religious study sessions, and other religious events.

124. Approximately thirty to forty people, including some Proposed Class Members, regularly attend the Synagogue's daily *mincha minyan*, which typically occurs at approximately 1:30 PM.

125. Pico-Robertson is a major center of Jewish life in Los Angeles.

126. It is home to a large community of Jews, many of whom are observant.

127. It features more than thirty kosher restaurants; multiple *mikvahs*;[38] several Jewish day schools; dozens of synagogues; multiple kosher butchers, grocery stores, and food shops; Judaica stores; and other resources and amenities focused on the Jewish community.

---

[38] A *mikvah* is a bath used for ritual immersion in Judaism.

24

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

C.    **The *Aliyah* Event.**

128.    In the days before June 23, 2024, a real-estate company known as "My Home in Israel" announced it would host an *Aliyah*-focused event at two Los Angeles-area synagogues.

129.    My Home In Israel specializes in helping American Jews buy homes in Israel so they can fulfill the *mitzvah* of *Aliyah*.

130.    The first event was scheduled to occur on June 20 at Shaarey Zedek, an Orthodox synagogue in North Hollywood.

131.    The second event (the "*Aliyah* Event") was scheduled to occur at the Adas Torah Synagogue on June 23.

132.    Although some outsiders have characterized the *Aliyah* Event as a mere housing or real-estate event, it was anything but that.

133.    For many in the Orthodox Jewish community, the *Aliyah* Event (and others like it), which educate people about making *Aliyah*, represents an integral part of Jewish religious observance.

134.    Meetings like the *Aliyah* Event are often held in synagogues and include prayer or Torah study because it is generally understood by the community that these are religious events.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

### D.    Aliyah Events Are Common Occurrences

135.    There are many realtors that wish to participate in Aliyah Events.

136.    There are 1,758 real estate agencies in Israel.[39] According to data from the Registrar of Realtors at the Ministry of Justice, at the end of 2024 there were 24,885 licensed real estate agents in Israel, double the number 15 years ago.[40]

137.    Tel Aviv has the largest number of real estate agents - 2,566. Last year, only 2,270 second-hand deals were completed there, which indicates that the city has more agents than deals. Nearby cities also have too many agents operating, relative to the number of second-hand deals: in Rishon LeZion, Ramat Gan, and Holon, the number of agents is 70% of the deals, and there is a similar ratio in Netanya.[41]

138.    The ad that Defendants used to instigate a riot was merely a common ad for residential real estate.

---

[39] SmartScrapers. "List of Real Estate Agencies in Israel." *Rentech Digital*, 5 May 2025, rentechdigital.com/smartscraper/business-report-details/list-of-real-estate-agencies-in-israel. Accessed 27 June 2025.
[40] Mirovsky, Arik. "Too Many Agents and Too Few Housing Deals in Tel Aviv." Globes, 11 Mar. 2025, en.globes.co.il/en/article-too-many-agents-and-too-few-housing-deals-in-tel-aviv-1001504249.
[41] *Id*.

26

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704



139.   The ad looks like a Netanya-based real estate agency selling properties in condo buildings in the southern beachfront of Netanya, just like the picture suggests.

140.   Defendants found this ad showing beachfront luxury condos in Netanya and, without any type of verification or evidence, started accusing attendees of war crimes and riling up their supporters to stop the event.

27

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

**E.    Defendants Organize Rioters (Including Does #1-100) To Assemble Outside the Synagogue.**

141.    Upon learning of the *Aliyah* Event, the Named Defendants organized a mob (including Does #1-100) to assemble outside the Synagogue.

142.    Specifically, the Named Defendants agreed with each other and worked collectively on a plan to disrupt, impede, and prevent the religious events at the Synagogue on June 23, 2024.

143.    The plan started with a collective decision to organize rioters in front of the Synagogue.

**Code Pink's Post**

144.    On Friday, June 21, 2024, CodePink Women for Peace's Los Angeles and Southeast Los Angeles chapters issued a collaborative post[42] on Instagram, claiming that "A MEGA ZIONIST REAL ESTATE EVENT IS IN LA THIS WEEK!"[43]

---

[42] A collaborative post is one that both accounts agree to have appear on their respective profiles. *See* HUBSPOT, *How to Collab Post on Instagram as a Brand or Creator [Steps + Tips]*, https://blog.hubspot.com/marketing/instagram-collab-post (last visited December 18, 2024).

[43] CODEPINK Southeast Los Angeles (@codepinksela) & CODEPINK Los Angeles (@codepinkla), INSTAGRAM, https://www.instagram.com/p/C8c6f8dyplb/?img_index=1 (last visited July 3, 2024).

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

145.   The post featured multiple slides, including a slide that urged: "HELP US ADVOCATE THE STOP OF HOMES BEING SOLD ON STOLEN PALESTINIAN LAND!"[44]

146.   The posts included the dates and addresses of two events—one at Shaarey Zedek in North Hollywood on June 20 and the second at Adas Torah on June 23.[45]

147.   Both Shaarey Zedek and Adas Torah are identified by name in CodePink's posts.

148.   Both synagogues are well-known in the community as being places of religious worship.

149.   The dates and addresses were placed inside inverted red triangles.[46]

150.   Since October 7, 2023, Hamas and its supporters (particularly those on social media) have used inverted red triangles as a symbol for Hamas and to celebrate its use of violence against Jews and Israelis.

151.   In other words, the inverted red triangle acts as a target designator to identify Jews and Jewish targets for extermination.[47]

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] Anti-Defamation League, *Glossary Terms: Inverted Triangle*, ADL,

29

**PYM's Post**



152.    Also, on June 20, 2024, PYM and the local chapter jointly posted a slide on its Instagram, calling for its members to show up to Adas Torah Synagogue on June 23 at "12 PM SHARP" at 9040 W Pico Blvd. Los Angeles.

153.    Defendant Schirf controls PYM's social media generally, and Defendant Ibrahim controls PYM's social media for the Los Angeles local chapter.

154.    Ms. Schirf and Mr. Ibrahim promoted the attack under the name of PYM on their Instagram profiles.

---

https://extremismterms.adl.org/glossary/inverted-red-triangle (last visited Sept. 28, 2024).

30

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

155.   The post declares: "OUR LAND IS NOT FOR SALE. STAND AGAINST SETTLER EXPANSION AT SUNDAY'S REAL ESTATE EVENT SELLING HOMES TO BUILD 'ANGLO NEIGHBORHOODS' IN PALESTINE."[48]

156.   The caption beneath the slide states: "Racist settler expansionists are not welcome in Los Angeles! This blatant example of land theft is operating in our own backyard. The Nakba[49] is ongoing and must be confronted!"

157.   It concludes: "FROM THE BELLY OF THE BEAST[.] NO JUSTICE, NO PEACE."[50]   The phrase "BELLY OF THE BEAST" likely refers to the synagogue, a place where Jews congregate to pray.

---

[48] *Id.*

[49] PYM LA-OC-IE (@pymlaocie) & Palestinian Youth Movement (@palestinianyouthmovement), INSTAGRAM, https://www.instagram.com/p/C8dActZyjiI/?igsh=d3o3eWw3OTZrZjhk (last visited July 3, 2024). *Nakba* refers to the defeat of the Arab armies in the 1948 war for Israel's independence after the Arab armies invaded Israel. *See Nakba*, Jewish Virtual Library, https://www.jewishvirtuallibrary.org/nakba (last visited July 12, 2024).

[50] *Id.*

31

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

## DEFENDANTS' PORTRAYAL OF ISRAELI RESIDENTIAL REAL ESTATE SALES AS JEWS STEALING PALESTINIAN LAND IN ACTS OF WAR CRIMES IS THE LATEST ANTISEMITIC BLOOD LIBEL

158.  Each of PYM's statements are blood libels designed to inspire modern day programs.

159.  Each of PYM's statements are false, antisemitic, and designed to inspire its supporters to show up and cause confrontation, making violence highly likely to occur.

160.  Throughout history, Jews have been accused of using the blood of non-Jews for "rituals." This accusation, which have come to be called "blood libel," dates to the second century BCE.[51]

161.  Historically, blood libels often took place close to Passover, when Jews were charged with using the blood of Christian children to bake matzahs. The proximity of such charges to Easter was thus also often associated with the continuing belief that Jews were responsible for the Passion and Crucifixion of Jesus. Blood libels, together with allegations of well poisoning, were a major theme

---

[51] The History of Antisemitism: Blood Libel." *Museum of Jewish Heritage*, Nov. 29, 2022, mjhnyc.org/events/the-history-of-blood-libel/ (last visited June 27, 2025).

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

in Jewish persecution in Europe throughout the Middle Ages and into the modern period.[52]

162.   Martin Luther, German theologian lent even further credence to the blood libel charge by accepting the Jewish use of Christian blood as fact in his *On the Jews and their Lies* (published in 1543). By the 17th century, blood libels became increasingly common in eastern Europe, particularly in Poland and Lithuania.[53]

163.   Blood libel accusations often led to pogroms, violent riots launched against Jews and frequently encouraged by government authorities.[54]

164.   The latest blood libel falsely accuses Jews and Israelis of selling real estate stolen from Palestinians constituting an international war crime.

## PYM's STATEMENTS ARE FALSE, ANTISEMITIC, AND DESIGNED TO STIR UP PASSIONATE CONFLICT

165.   PYM's statements are fueled by knowingly false statements designed to incite passion and cause conflict.

166.   PYM's statements are fueled by the lie that the Synagogue was about to commit an international war crime by facilitating the "theft" of Palestinian land.

167.   While PYM is entitled to its freedom of speech to be wrong about the legality of residential real estate transactions in Israel generally, falsely advising

---

[52] *Id.*
[53] *Id.*
[54] *Id.*

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

33

their followers of the legality of the Aliyah event and that it was possible to prevent a "war crime" by obstructing the Aliyah Event has violent consequences that PYM is aware of and intends for them to occur.

168.   Every part of their post is an antisemitic lie designed to inflame antisemitism and passion amongst their supporters and instigate the maximum amount of conflict directed at the synagogue and those attending the Aliyah event.

169.   Anti-Zionism (opposition to the State of Israel's existence) has been equated with antisemitism (invidious discrimination against Jews) by Congress,[55] the White House,[56] and judges in this district.[57]

170.   The International Holocaust Remembrance Association ("IHRA"), an intergovernmental organization with 35 Member Countries, defines antisemitism and provides useful examples.[58]

---

[55] *See* Strongly Condemning and Denouncing the Drastic Rise of Antisemitism in the United States and Around the World, H. Res. 894, 118th Cong. (2024) (the House of Representatives "clearly and firmly states that anti-Zionism is antisemitism").

[56] *See* Exec. Order No. 13,899, 84 Fed. Reg. 68,779 (Dec.11, 2019) (stating "all executive departments and agencies" shall consider the "working definition of anti Semitism adopted . . . by the International Holocaust Remembrance Alliance" which counts as antisemitism the "targeting the State of Israel").

[57] *Frankel v. Regents of the Univ. of Cal.*, No. 2:24-cv-04702-MCS-PD, 2024 U.S. Dist. LEXIS 146433, at *22 (C.D. Cal. Aug. 13, 2024) (finding that supporting the State of Israel can be part of Jewish students core religious beliefs).

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

171. The IHRA explains that manifestations of antisemitism "might include the targeting of the state of Israel, conceived as a Jewish collectivity."

172. Among the IHRA examples of antisemitism include "applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation," and "denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor."

173. The Defendants' social media posts were not designed to create a lawful protest. They were designed to maximize passion, hatred, and antisemitism. They were designed to prevent lawful events from occurring.

**CALLING FOR PROTESTERS TO APPEAR AT THE FRONT ENTRANCE TO ADAS TORAH SYNAGOGUE AT THE EXACT TIME OF THE ALIYAH EVENT IS LIKELY TO RESULT IN CONFLICT**

174. The post was designed to cause maximum conflict with people attempting to attend the Aliyah Event.

175. The post called for protestors to appear at the exact entrance to the synagogue at the exact start time of the event. PYM gave the exact address for the front of the synagogue, a rather small entrance area (at 9040 W Pico Blvd. Los Angeles).

176. By appearing in the exact entrance, violence between those seeking to enter the synagogue and protesters occupying the entrance was highly likely.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

177.    The post specifically called for confrontation to prevent the event from happening: "This blatant example of land theft is operating *in our own backyard*. The Nakba[59] is ongoing and *must be confronted!*" (emphasis added). It concludes: "NO JUSTICE, NO PEACE."[60]

178.    Plaintiff and the putative class members have a genuine fear that of violence that Defendants' will cause violence to them while they are congregating or attempting to congregate at Adas Torah.

**Blood Libel 1: Synagogue Attendees are "Stealing Land" from Palestinians**

179.    PYM's post states: "OUR LAND IS NOT FOR SALE. STAND AGAINST SETTLER EXPANSION AT SUNDAY'S REAL ESTATE EVENT SELLING HOMES TO BUILD 'ANGLO NEIGHBORHOODS' IN PALESTINE."[61]

---

[59] PYM LA-OC-IE (@pymlaocie) & Palestinian Youth Movement (@palestinianyouthmovement), INSTAGRAM, https://www.instagram.com/p/C8dActZyjiI/?igsh=d3o3eWw3OTZrZjhk (last visited July 3, 2024). *Nakba* refers to the defeat of the Arab armies in the 1948 war for Israel's independence after the Arab armies invaded Israel. *See Nakba*, Jewish Virtual Library, https://www.jewishvirtuallibrary.org/nakba (last visited July 12, 2024).

[60] *Id.*

[61] *Id.*

36

180.   "This blatant example of land theft is operating in our own backyard. The Nakba[62] is ongoing and must be confronted!"

181.   PYM's accusation that attendees of the synagogue are criminals and that the Aliyah Event involves building expanded settlements on stolen land is false and inflammatory on multiple levels.

182.   In fact, these are lawful listings for the sale of residential real estate in Israel.

183.   The congregants are exercising their core First Amendment rights by attending a meeting to discuss real estate in Israel. PYM hopes for its followers to deprive the synagogue members of their First Amendment rights.

184.   The laws in Israel clearly permit their citizens to conduct routine retail real estate transactions.

185.   It is merely PYM's general antisemitic belief that Jews and Israelis are not entitled to their own land in Israel.

---

62 PYM LA-OC-IE (@pymlaocie) & Palestinian Youth Movement (@palestinianyouthmovement), INSTAGRAM, https://www.instagram.com/p/C8dActZyjiI/?igsh=d3o3eWw3OTZrZjhk (last visited July 3, 2024). *Nakba* refers to the defeat of the Arab armies in the 1948 war for Israel's independence after the Arab armies invaded Israel. *See Nakba*, Jewish Virtual Library, https://www.jewishvirtuallibrary.org/nakba (last visited July 12, 2024).

37

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

186.   PYM recklessly encourages its supporters to assume that the event is illegal without any evidence. If it were illegal for people to meet at the synagogue and discuss Israeli real estate, then the local courts and police would easily be able to prevent the event from occurring.

187.   However, the fact that police show up to protect the rights of people to enter the synagogue freely indicates that there is nothing illegal happening at the synagogue. PYM is well aware that there is nothing illegal at these synagogue events, but falsely informs its supporters otherwise in order to instigate maximum confrontation.

**Blood Libel 2: Desiring "Anglo" Neighborhoods Is Racist**

188.   The caption beneath the slide states: "Racist settler expansionists are not welcome in Los Angeles! and references "Anglo" neighborhoods.

189.   PYM implies the use of "Anglo" in the ad means that the event is racist because "Anglo" is associated with white people.

190.   However, the use of "Anglo" refers to homes where English-speaking neighbors and services are likely to be available. This is not unexpected for a real estate event for Americans. It is not a reference to building homes on others' land.

191.   PYM intends that its supporters believe that the synagogue attendees are racist to instigate the most passionate response likely to cause violence.

38

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

## Blood Libel 3: The Aliyah Event is "Settler Expansion"

192.  PYM informs its supporters that the Aliyah Event is "Settler Expansion."

193.  "Settler Expansion" is one of the most inflammatory accusations possible meant to stir up passionate hatred and create violent conflict.

194.  Settler Expansionism or Colonialism means is a reference to early Americans displacing and committing genocide against the native populations.

195.  PYM uses it here to allege Israel is committing a similar atrocity against Palestinians similarly to what Americans did to the native populations.

196.  The California Ethnic Studies Model Curriculum teaches that "colonial" behavior is equated with "racist, bigoted, [and] discriminatory" conduct on "multiple levels." [63]

197.  The notion that there is a genocide against the Palestinians is false and inflammatory. The population of Palestinians continues to grow, contrary to claims of genocide.

---

[63] See California Department of Education. Ethnic Studies Model Curriculum. Adopted by the California State Board of Education, 18 Mar. 2021. California Department of Education Press, Sacramento, 2022. PDF, p. 57, https://www.cde.ca.gov/ci/cr/cf/documents/ethnicstudiescurriculum.pdf (last accessed June 27, 2025).

39

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

198.   The current conflict was sparked when Hamas committed an offensive attack against Israel on October 7, 2023, abducted hostages, and has since hid for cover among civilian population. Israel has a right under international law to defend itself and its population from terrorism.

199.   The accusation of unjust colonialism implies that decolonization is necessary and justified.

200.   "Decolonization" is an attempt to justify Hamas' October 7 attack on Israel and encourage other similar attacks as similarly justified.

### PYM's Posts Are Antisemitic under the IHRA Principles

201.   Not only are PYM's posts false, they are antisemitic under a number of IHRA principles, including:

- Holding Jews collectively responsible for actions of the state of Israel.

- Applying double standards by requiring of Israel a behavior not expected or demanded of any other democratic nation

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

### Defendants Protesting at Synagogues has Repeatedly Caused Violence And Demonstrates Violence is Likely to Occur

202.   Defendants have been successful in riling up their supporters to create chaos and violence in previous real estate events and they continue doing

40

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

so. Defendants' strategy permits them to arbitrarily target synagogues by locating relatively common advertisements for Israel real estate events.

203.    Mr. Ibrahim also has a history of violence related to his activism.

204.    Upon information and belief, Mr. Ibrahim was arrested for violent conduct while participating at an encampment at University of Southern California.

205.    According to public records, the Los Angeles Police Department arrested Ibrahim a/k/a Remo Abboud on May 4, 2024 at 14:59 at 649 w. 34th St. in Los Angeles.

206.    The arrest was for misdemeanor battery against a school employee (Cal. Pen. Code § 243.6).

207.    Ibrahim knew, or reasonably should have known, that violence would be the result of the riot, given that he was arrested for a violent act that occurred at a similar riot just weeks before Adas Torah.

208.    Ibrahim learned how to plan Synagogue events from Rich Siegel, from Teaneck, New Jersey.

209.    Siegel's protests in Teaneck against Synagogue Real Estate Events have also caused violence.

210.    At a synagogue protest in March 2024 in Teaneck, NJ two anti-Israel

41

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

protesters were arrested for spraying cars with paint. Protesters also hurled objects at commuters and pedestrians. The demonstration drew an estimated 1,000 protestors, most non-Teaneck residents.[64]

211.   The Teaneck Police Department has racked up nearly $130,000 in overtime pay as a result of demonstrations and other events related to the Gaza conflict since the Oct. 7 Hamas attack on Israel, according to township officials. Englewood police have spent more than $32,000 in that time.[65]

212.   During a previous PYM protest, the organizers blocked traffic to protest Israel, causing a class action suit against PYM for false imprisonment.[66]

213.   On April 3, 2024, PYM organized a protest in which protesters attacked Toronto police and threw horse manure. Assia Rami, 24, was charged with assault of a police officer with a weapon for allegedly throwing horse manure

---

[64] "'Violent' Anti-Israel Protest Targets Teaneck Synagogue." Israel National News, 11 Mar. 2024, www.israelnationalnews.com/news/386582. Accessed 27 June 2025.

[65] Yellin, Deena. "Here's What Teaneck, Englewood Spend to Police Gaza Protests." *NorthJersey.com*, 13 June 2024, www.northjersey.com/story/news/bergen/teaneck/2024/06/13/nj-police-overtime-israel-gaza-protests/73892951007/. Accessed 27 June 2025.

[66] Hamilton Lincoln Law Institute. *HLLI Sues Jewish Voice for Peace and Other Anti-Israel Activists Over Traffic Blockades in Washington, D.C.*, 31 Jan. 2025, HLLI, https://hlli.org/hlli-sues-jewish-voice-for-peace-and-other-anti-israel-activists-over-traffic-blockades-in-washington-d-c/. Accessed 27 June 2025.

42

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

at police. Celeste Xiaoying Furlotte-Bois, 27, faces the same charge for allegedly using a flagpole to "spear" an officer.[67]

214.    In May 2024, PYM's threats were able to get an Israel Summit cancelled at an event in Dallas, Texas due to security concerns.[68]

215.    On July 15, 2024, a venue had to be moved due to threats against a similar Israel real estate event.[69]

216.    Pro-Palestinian groups have also called for demonstrations at synagogues for other reasons, such as holding a fundraiser for an Israeli search and rescue group.[70]

217.    In January 2025, pro-Palestinian protestors targeted a synagogue in South Orange, New Jersey, where they chanted outside spray painted anti-Semitic

---

[67] Starr, Michael. "Anti-Israel Activists Fling Horse Manure, Attack Toronto Police with Pole." *The Jerusalem Post*, 3 Apr. 2024, www.jpost.com/diaspora/article-795079. Accessed 27 June 2025.

[68] Brook, Larry. "Major Pro-Israel Summit in Dallas Area Canceled Due to Security Threats." JNS, 5 June 2025, Larry Brook, Israel InSight, https://www.jns.org/major-pro-israel-summit-in-dallas-canceled-due-to-security-threats/. Accessed 27 June 2025.

[69] Frankel, Jacob. "Anti-Israel Protesters Target Queens Synagogue Over Real-Estate Sale Despite Venue Change." *The Algemeiner*, 15 July 2024, www.algemeiner.com/2024/07/15/anti-israel-protesters-target-queens-synagogue-israel-real-estate-sale-despite-venue-change/. Accessed 27 June 2025.

[70] Holt, Faygie. "Huge Jewish Counter Protest Sees Off Palestine Supporters at New Jersey Synagogue." *The Jewish Chronicle*, 2 Apr. 2024, www.thejc.com/news/usa/huge-jewish-counter-protest-sees-off-palestine-supporters-at-new-jersey-synagogue-tx04tbbg. Accessed 27 June 2025.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

graffiti on its driveway as members of the Israeli military spoke inside. The protest is being investigated as hate crime.[71]

218. In February 2025, pro-Palestinian protests at synagogue real estate event also turned violent. One person was charged with third-degree assault for punching someone in the face at the scene. The pro-Palestinian protest's organizer, Pal-Awda, called on its followers to "flood Borough Park," an allusion to Hamas' name for its Oct. 7, 2023, attack on Israel, and to "show up in the masses to oppose the sale of stolen land, especially when it is happening in our own backyards!"[72]

219. There is also a risk of violence from counter protesters. An Indian Muslim man was attacked while participating in the pro-Palestinian rally near Congregation Ohr Torah in West Orange on Nov. 13, 2024. The protester required multiple stitches after he was pepper-sprayed and bashed in the head with a metal flashlight by a counter-protester.[73]

---

[71] Alexander, Dan. "Protest at NJ Synagogue Hosting IDF Soldiers Investigated as Hate Crime." *New Jersey 101.5*, 27 Jan. 2025, www.nj1015.com/protest-at-nj-synagogue-hosting-idf-soldiers-investigated-as-hate-crime/. Accessed 27 June 2025.

[72] "Brawls Break Out Surrounding Pro-Palestinian Protest in Heavily Jewish Neighborhood of Borough Park." The Jewish Chronicle (Times of Israel), 19 Feb. 2025, jewishchronicle.timesofisrael.com/brawls-break-out-surrounding-pro-palestinian-protest-in-heavily-jewish-neighborhood-of-borough-park/. Accessed 27 June 2025.

[73] Charges Filed in Alleged Bias Attack Against Pro-Palestinian Protester." NorthJersey.com, 19 Feb. 2025, www.northjersey.com/story/news/2025/02/19/nj-bias-attack-charges-pro-palestinian-protester/79134105007/. Accessed 27 June 2025.

44

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

### F.   Defendants' Members and Does #1-100 Riot Outside the Synagogue.

220.   On June 23, 2024—the day of the *Aliyah* Event—the Synagogue was scheduled to host several additional religious events, including but not limited to, at least one *minchah minyan*, as well as multiple Torah study sessions.

221.   As the starting time of the *Aliyah* Event approached, more than two-hundred rioters (including Does #1-100) that had been organized and incited by the Named Defendants, marched into Pico-Robertson—the heart of Los Angeles's Jewish community—and physically obstructed access to the Synagogue.

222.   Chaos and violence quickly ensued.

223.   Specifically, the rioters, which included Does #1-100 and who were incited and organized by Named Defendants, donned masks and held signs, threw punches at Synagogue members and Jews who had arrived to provide support for their fellow worshippers, and engaged in other acts of violence.

224.   Many of those rioters, including Does #1-100, were armed with various weapons, including bear spray and blunt objects.

225.   One of those rioters was observed hitting a Jewish individual in the head and back with a metal water bottle.

226.   Another rioter was observed filling a sock with rocks and brandishing the rock-filled sock as a weapon.

45

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

227.   Some rioters arrived wearing ski goggles in preparation for the violence.[74]

228.   Many of the rioters arrived wearing matching keffiyehs.

229.   Upon information and belief, these keffiyehs were distributed by Named Defendants to Does #1-100 to conceal the rioters' identities.

230.   The rioters were also observed organizing in groupings in neighboring streets and were systematically sent to the Synagogue when reinforcement protesters were needed due to increased Jewish and police presence.

231.   This was observed by multiple people and demonstrates that the rioters were organized, coordinated, and controlled by Named Defendants.

232.   Others wore Hamas's green headbands, while chanting "Intifada!" and calling for violence against Jews.[75]

233.   While the riot was raging, worshippers (including Plaintiff Helmann, and Proposed Class Members) were attempting to enter the Synagogue to gather or

---

[74] Michael Starr, *Anti-Israel Protestors Beat, Bear Mace Jews, Journalists At LA Synagogue*, JERUSALEM POST (June 24, 2024, 2:13 AM), https://www.jpost.com/breaking-news/article-807411.

[75] Summer Lin et al., *More Details Emerge On Protest Outside L.A. Synagogue*, YAHOO! NEWS (June 27, 2024, 6:00 AM), https://au.news.yahoo.com/very-traumatic-medic-describes-things-100038626.html.

46

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

attend one or several of the following: a prayer session or *minyan*; a Torah study session; and the *Aliyah* Event.

234.   The rioters (including Does #1-100) prevented individuals (including Plaintiff Helman and Proposed Class Members) from gathering and exercising their First Amendment right to practice their religion at the Synagogue.

235.   By stoking such unrest and perpetuating violence, Named Defendants and Does #1-100 prevented Plaintiff Helmann and Proposed Class Members from practicing their religion free from persecution, intimidation, and violence.

236.   Footage of the violence quickly spread throughout social media.[76]

237.   Scenes of blood on the streets, use of bear spray, and the brandishing of blunt-force weapons (including, among other things, a skateboard), permeated cyberspace and were reported by dozens of news outlets.

238.   About sixty police officers were called to the scene to stop the violent rioters, while many people were treated for their injuries.

239.   Police arrested Doe #1, who was carrying a spiked post, for possessing a prohibited item.[77]

---

[76] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/reel/C8khglxyMw4/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

[77] *See Person with spiked post arrested in clash outside Los Angeles*

47

240.    Pico-Robertson resident Talia Regev tried to enter the Synagogue, but she was bear sprayed.[78]

241.    Naftoli Sherman, suffered a broken nose and a black eye after being attacked by rioters.[79]

**G.    Plaintiff Ronen Helmann's Experiences on the Day of the Riot.**

242.    On the day of the riot, Plaintiff Ronen Helmann was walking in the Pico-Robertson neighborhood where he resides.

243.    Plaintiff Helmann frequently congregates and prays at the Synagogue.

244.    Plaintiff Helmann noticed Jane Does 1-3—women who were wearing headscarves and masks covering their faces—walking from house to house.

245.    Plaintiff Helmann saw that Jane Does 1-3 were checking the doors of the houses for *mezuzot*.[80]

246.    Jane Does 1-3 appeared to be taking pictures of homes with *mezuzot*.

_____

*synagogue,* NBC LOS ANGELES, (June 24, 2024), https://www.nbclosangeles.com/news/local/arrest-la-synagogue-protest-israelpalestine/3443019/.

[78] *See L.A.'s Adas Torah Violently Attacked by Pro-Palestinian Protestors at Real Estate Event,* THE JEWISH LINK (June 27, 2024), jewishlink.news/l-a-s-adas-torah-violently-attacked-by-pro-palestinianprotestors-at-real-estate-event/.

[79] *Id.*

[80] A *mezuzah* is a prayer scroll affixed by Jews to the doorposts of their homes.

48

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

247. Plaintiff Helmann also noticed that Jane Does 1-3 were marking the cars that they suspected were associated with houses with *mezuzot*.

248. Jane Does 1-3 were communicating on cell phones.

249. Plaintiff Helmann became frightened, so he began walking toward the Synagogue to congregate with other community members and pray for the safety of the Synagogue.

250. As he got closer to the Synagogue, Plaintiff Helmann saw a mob of anti-Israel protesters (John Does 2-11) standing in the way of the entrance to the Synagogue.

251. Plaintiff Helmann saw that John Does 2-11 had masks, backpacks, and bear spray.

252. He feared that they had other weapons.

253. As Plaintiff Helmann walked toward the Synagogue, John Does 2-11 approached him with cameras, came right up to his face, and took pictures of him.

254. John Does 2-10 then started yelling at him.

255. John Doe 2 yelled at Plaintiff Helmann, calling him a "nazi."

256. John Doe 3 yelled: "Hitler didn't finish the job!"

257. John Doe 4 yelled: "Baby murderer!"

258. John Doe 5 yelled: "Colonizers!"

49

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

259. John Doe 6 asked: "To which God are you praying?"

260. John Doe 7 yelled: "Leave the neighborhood, we are coming!"

261. John Doe 8 yelled: "Itbach el yehud!" ("slaughter the Jews" in Arabic).

262. John Does 9-11 yelled other racial and ethnic slurs about Jews.

263. Because of the intimidating and threating presence and conduct of the mob thus rendering passage to and from the Synagogue unreasonably difficult or hazardous, Plaintiff Helmann decided it was not safe to enter the Synagogue to pray, so he instead returned home.

**H.    SCLJ Members Experiences on the Day of the Riot.**

264. SCLJ Member #1 was one of the worshippers who was prevented by the mob from exercising his constitutionally and statutorily protected free-exercise rights to attend the *Aliyah* Event.

265. SCLJ Member #1 had preregistered to attend the *Aliyah* Event.

266. SCLJ Member #1 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted him into the building.

267. SCLJ Member #1 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

268. SCLJ Member #2 was one of the worshippers who was initially prevented by the mob from exercising her constitutionally and statutorily protected free-exercise rights to attend both the *Aliyah* Event and an afternoon prayer service.

269. SCLJ Member #2 had preregistered to attend the *Aliyah* Event.

270. SCLJ Member #2 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted her into the building.

271. SCLJ Member #2 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

272. SCLJ Member #2 did not find an available prayer service to join.

273. On information and belief, the reason why SCLJ Member #2 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

274. SCLJ Member #3 was one of the worshippers who was initially prevented by the mob from exercising her constitutionally and statutorily protected free-exercise rights to attend both the *Aliyah* Event and an afternoon prayer service.

275. SCLJ Member #3 had intended to attend the *Aliyah* Event with her mother.

276. SCLJ Member #3 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted her into the building.

51

277.   SCLJ Member #3 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

278.   SCLJ Member #3 did not find an available prayer service to join.

279.   On information and belief, the reason why SCLJ Member #3 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

280.   SCLJ Member #4 was one of the worshippers who was initially prevented by the mob from exercising his constitutionally and statutorily protected free-exercise rights to attend the *Aliyah* Event and to participate in an afternoon prayer service.

281.   SCLJ Member #4 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted him into the building.

282.   SCLJ Member #4 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

283.   SCLJ Member #4 did not find an available prayer service to join.

284.   On information and belief, the reason why SCLJ Member #4 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

52

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

285.   SCLJ Member #5 was one of the worshippers who initially was prevented by the mob from exercising his constitutionally and statutorily protected free-exercise rights to attend the *Aliyah* Event and to participate in an afternoon prayer service.

286.   SCLJ Member #5 had preregistered to attend the *Aliyah* Event.

287.   SCLJ Member #5 managed to enter the Synagogue through an alleyway behind the building, where an armed security guard admitted him into the building.

288.   SCLJ Member #5 learned of this entrance through a WhatsApp group, though not all attendees of the June 23 events were in the group.

289.   SCLJ Member #5 did not find an available prayer service to join.

290.   On information and belief, the reason why SCLJ Member #5 was unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

291.   SCLJ Member #6 had attended morning prayer services at the Synagogue and remained inside the building when the riot commenced.

292.   When the riot began, SCLJ Member #6 was attempting to study Torah, but he had trouble doing so because of the violent commotion outside the building, as rioters blocked access to and from the Synagogue and the adjacent sidewalks.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

293.    SCLJ Member #7 was one of the worshippers who was prevented entirely by the mob from exercising his constitutionally and statutorily protected free-exercise rights to participate in an afternoon prayer service, which he regularly attends at the Synagogue.

294.    SCLJ Member #7 was not a member of the aforementioned WhatsApp group containing some of the Synagogue's congregants, so he was unaware of the alternate entrance.

295.    Therefore, SCLJ Member #7 was barred entirely from entering the Synagogue.

296.    Though all three events continued at the Synagogue on June 23, 2024, upon information and belief, many regular members who either attend *minyan* or study Torah at the Synagogue in the afternoon were entirely unable to do so, much like SCLJ Member #7.

297.    Similarly, upon information and belief, many individuals who would have otherwise attended the *Aliyah* Event were prevented or dissuaded from doing so because of the mob.

298.    Of those Proposed Class Members who eventually were able to attend events at the Synagogue, their initial attempts to attend the events were obstructed by rioters.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

299.    Moreover, those Proposed Class Members had to expose themselves to physical danger to enter the Synagogue.

300.    On information and belief, the reason why the members who were able to enter the Synagogue were nonetheless unable to find an available prayer service is because the prayer services were interrupted and obstructed by the mob.

**I.    Pollak's Experiences on the Day of the Riot.**

301.    On the day of the riot, Noah Pollak came to the Synagogue with his children to gather with other members of his faith and to learn more about how he could purchase real estate in Israel, which he believed would fulfill important religious requirements.

302.    When Pollak arrived on Pico Boulevard—a major four-lane road—he noticed the street had been shut down by the police and an LAPD helicopter circled noisily overhead.

303.    Dozens of police officers stood tightly together in riot gear directly in front of the Synagogue

304.    They had their nightsticks drawn.

305.    As Pollak inched closer, he noticed the rioters behind the phalanx of LAPD officers, on the sidewalk in front of the Synagogue.

55

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

306.    When Pollak approached the police with his children and asked if he could enter the Synagogue, the law-enforcement officials told him not to come any closer and instructed him to leave.

307.    Pollak calmly asked the officers: "Shouldn't you be making sure this place stays open?"

308.    Their reply was: "You should leave."

309.    Due to the rioters' slurs, as well as their aggressive and violent behavior, Pollak quickly moved himself and his kids to safety and eventually entered the Synagogue through an unmarked side entrance.

310.    While he eventually entered the Synagogue, his passage to and from it was rendered unreasonably difficult and hazardous due to the violent and hate-fueled actions of the rioters.

311.    Pollak's wife also encountered the police and rioter blockade in front of the Synagogue

312.    She, too, was unable to enter the Synagogue through the front.

313.    Pollak guided her through the violence to the same side entrance he previously used.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

314.    Again, while Pollak's wife eventually entered the Synagogue, her passage to and from it was rendered unreasonably difficult and hazardous due to the violent and hate-fueled actions of the rioters.

### J.    Defendants Ratify and Fail to Repudiate The Unlawful Riot

315.    The violence—and Named Defendants' and Does #1-100's interference with Plaintiffs' attempts to exercise their First Amendment rights at the Synagogue—were reported in real time.

316.    Media reports and footage detailed the scenes of blood on the streets, the use of bear spray, and the brandishing of makeshift weapons, including a spiked post.

317.    *The Wall Street Journal* published an article titled: "Pro-Palestinian Protesters Block Access to Los Angeles Synagogue in Violent Clash."[81]

318.    KTLA 5 news station also reported that, "[a]ccording to video posted to the Citizen app, pro-Palestinian protesters blocked the entrance to a synagogue."[82]

---

[81] Alyssa Lukpat, *Pro-Palestinian Protesters Block Access to Los Angeles Synagogue in Violent Clash*, WALL ST. J. (June 24, 2024, 5:48 PM), https://www.wsj.com/us-news/pro-palestinian-protesters-block-access-to-los-angeles-synagogue-in-violent-clash-7d48098f.

[82] Austin Turner & Josh DuBose, *Pro-Palestinian And Pro-Israeli Demonstrators Clash Outside Synagogue In Los Angeles*, KTLA 5, (June 23, 2024, 2:34 PM), https://ktla.com/news/local-news/protesters-allegedly-block-entrance-to-synagogue-in-los-angeles/.

57

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

319.  The next day, *The Jerusalem Post* published an article titled: "Anti-Israel protesters beat, bear mace Jews, journalists at LA synagogue."[83]

320.  On the day of the riot, CodePink's Southeast Los Angeles chapter posted on its Instagram account a video from the riot, confirming its presence outside the Synagogue.[84]

321.  The same day, the Southeast Los Angeles chapter, in collaboration with the CodePink's Los Angeles chapter and CodePink's national organization, posted more footage from the riot, including another slide featuring a giant inverted red triangle with the address of the Synagogue inside it.[85]

322.  The photograph was captioned, in part: "Our comrades witnessed nothing out of the ordinary: madness, chaos, agitation, provoking and the use of physical force by the zi0nist [*sic*] community and LAPD."[86]

---

[83] Michael Starr & Jerusalem Post Staff, *Anti-Israel protesters beat, bear mace Jews, journalists at LA synagogue*, JERUSALEM POST (June 24, 2024).

[84] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/reel/C8khglxyMw4/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

[85] CODEPINK Southeast Los Angeles Chapter (@codepinksela) & CODEPINK Alert (@codepinkalert), INSTAGRAM, https://www.instagram.com/p/C8lLvLIJu9h/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA%3D%3D&img_index=2 (last visited July 3, 2024).

[86] *Id.*

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

323.   In a public statement issued on June 24, 2024, CodePink acknowledged that its organizers and members attended the riot that blocked the entrance to the Synagogue: "While our comrades were physically assaulted, pepper/bear sprayed, and attacked as they walked back to their cars, LAPD did nothing to keep us safe but rather pushed and used their combat toys to add to injury."[87]

324.   The statement continued: "[S]hame on LA for allowing the hosting of these types of events that promote illegal sales of Palestinian territory and homes!"[88]

325.   Indeed, CodePink's website states: "CODEPINK recognizes Palestinians as the rightful owners and caretakers of Palestine, their indigenous homeland," and "[w]e support Palestinians' right to resist the violent Israeli occupation of Palestine."[89]

326.   CodePink's website further emphasizes that "[w]e must express our outrage."[90]

---

[87] CODEPINK Los Angeles Chapter (@codepinkla) & CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/p/C8nHwetSMQR/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA%3D%3D&img_index=1 (last visited July 3, 2024).

[88] *Id.*

[89] CODEPINK- JUSTICE FOR PALESTINE, https://www.codepink.org/palestine (last visited July 3, 2024).

[90] *Id.*

59

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

327.    On June 24, 2024, CodePink's national organization, in collaboration with its own Southeast Los Angeles chapter, posted on its Instagram a slide stating that "there was a peaceful protest against the illegal sale of stolen land in Palestine in a synagogue. Zionists attacked peaceful protesters, stole their phones, and LAPD watched on and helped."[91]

328.    Beneath the slide was a longer caption stating that "[n]o religious services were scheduled at the time of the real estate sale . . . . Contrary to what the media is falsely reporting, the entrance was never blocked by anyone."[92]

329.    Both statements by CodePink are false: there were religious services scheduled at the Synagogue during the riot, the *Aliyah* Event itself was religious in nature, and the rioters (including Does #1-100) did in fact block the entrance to the Synagogue.

330.    Despite their demonstrable falsity, similar statements were posted on the Instagram accounts of CodePink's Los Angeles and Southeast Los Angeles chapters.[93]

---

[91] CODEPINK Alert (@codepinkalert) & CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/p/C8nDkh3y06J/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

[92] *Id.*

[93] CODEPINK Southeast Los Angeles Chapter (@codepinksela),

60

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

331.   On Tuesday, June 25, 2024, the Southeast Los Angeles chapter posted a video of a press conference with multiple speakers.

332.   The first speaker—whose name is not provided—stated that the Synagogue "is complicit in war crimes through its hosting of this event."[94]

333.   She added: "The attendees of this illegal sale event and the LAPD unleashed violence on protesters for daring to challenge the illegal sale of Palestinian land."[95]

334.   She finished by assuring that "[w]e will continue to challenge the sale of stolen Palestinian land in North American cities, no matter where these events take place."[96]

335.   The next day, CodePink's Southeast Los Angeles chapter posted a single slide stating: "FUCK ISRAEL."[97]

---

INSTAGRAM, https://www.instagram.com/p/C8nHwetSMQR/?igsh=OWRmNXN3NW80Yzli, (last visited July 5, 2024).

[94] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/reel/C8p9LjVSX72/?igsh=ZjRlZHhmY2N2eTI4 (last visited July 5, 2024).

[95] Id.

[96] Id.

[97] CODEPINK Southeast Los Angeles Chapter (@codepinksela), INSTAGRAM, https://www.instagram.com/p/C8sWnHZy_R9/?utm_source=ig_web_copy_link&i

61

336.    Defendant Ibrahim gave an interview after the attack, where he proudly stated: "This real estate event was advertised for weeks, the LA community was outraged, and we showed up, because we show up to confront Zionism and white supremacy wherever it manifests, that's the bottom line."

337.    PYM posted on social media on June 24, 2024, saying "We will not back down: no institution complicit in colonization and genocide gets a pass. Across North America, we have a role to play in the dismantling of Zionism, its genocidal war machine, and its political institutions wherever they manifest. The selling of stolen Palestinian land in North American cities will not go unchallenged, no matter where the events take place. We can and will continue to confront any institution that seeks to promote, celebrate, or aid the Zionist settler project in our own backyards. "[98]

### K.    Named Defendants' and Does #1-100's Riot Is Universally Condemned.

338.    The riot outside of the Synagogue was roundly condemned across the political spectrum.

339.    Los Angeles Mayor Karen Bass released a statement on the day of the riot: "Today's violence in the Pico-Robertson neighborhood was abhorrent, and

gsh=MzRlODBiNWFlZA== (last visited July 3, 2024).

[98] https://www.instagram.com/p/C8n3TfEpEVa/?img_index=4

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

blocking access to a place of worship is unacceptable . . . . I want to be clear that Los Angeles will not be a harbor for antisemitism and violence. Those responsible for either will be found and held accountable."[99]

340.   Similarly, President Joe Biden denounced the violent rioters the day-of: "I'm appalled by the scenes outside of Adas Torah synagogue in Los Angeles. Intimidating Jewish congregants is dangerous, unconscionable, antisemitic, and un-American. Americans have a right to peaceful protest. But blocking access to a house of worship—and engaging in violence—is never acceptable."[100]

341.   And California Governor Gavin Newsom stated that "[t]he violent clashes outside Adas Torah in Los Angeles are appalling. There is no excuse for targeting a house of worship. Such antisemitic hatred has no place in California."[101]

## **CLASS ACTION ALLEGATIONS**

342.   Plaintiff Helmann brings this lawsuit as a class action under Federal Rules of Civil Procedure 23(a); (b)(1)–(b)(3); and/or (c)(4), on behalf of himself and all others similarly situated as members of the following Proposed Class.

---

[99] @MayorOfLA, X (June 24, 2024, 1:27 AM), https://x.com/MayorOfLA/status/1805110392806642141.

[100] @POTUS, X (June 24, 2024, 10:56 AM), https://x.com/POTUS/status/1805253626551497103?ref_src=twsrc%5Etfw.

[101] @CAgovernor, X (June 24, 2024, 1:16 AM), https://x.com/CAgovernor/status/1805107636368810029.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

343.   This action concerns the Named Defendants' and Does #1-100's actions both prior to and on June 23, 2024, and in relation to the riot at the Synagogue.

344.   The Proposed Class is defined as:

**The Synagogue Class**

> All persons who intended to, planned to, attempted to, or did in fact enter the Adas Torah Synagogue in Los Angeles, California, on June 23, 2024, to exercise their First Amendment right of religious freedom, but who had their First Amendment right of religious freedom interfered with by the conspiracy and consequent actions of Named Defendants and Does #1-100.

345.   Excluded from the Class are: (A) Named Defendants and Does #1-100, including any entity or division in which Defendants and Does #1-100 have a controlling interest; (B) Named Defendants' and Does #1-100's agents, representatives, officers, directors, employees, trustees, members, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Named Defendants or Does #1-100; (C) other organizations, entities, members, officers, and persons affiliated with Named Defendants and Does #1-100; (D) the Judges to whom this case is assigned, their staff, and their immediate families; and (E) governmental entities.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

346.   Plaintiff Helmann reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

347.   Certification of Plaintiff Helmann's claims for class-wide treatment is appropriate because Plaintiff Helmann can prove the elements of his claims on a class-wide basis using the same evidence that would be used in individual actions alleging the same claims.

348.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Rule 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

### Numerosity and Ascertainability

349.   Although the exact number of Class Members is uncertain, the number is large enough to demonstrate that joinder is impracticable.

350.   Over one-hundred people were planning to attend and/or attempted to attend religious events at the Synagogue on June 23, 2024, and thus satisfy the proposed class definition.

351.   The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

65

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

352.   Class Members are readily ascertainable from Synagogue membership and attendance rolls, as well as through the list of registrants for the *Aliyah* Event.

353.   Additionally, Class Members can be ascertained and identified through eyewitness accounts, video footage, and the many news and police reports surrounding the riot.

### Predominance of Common Questions

354.   There are numerous questions of law and fact common to the Class Members that predominate over any individual questions.

355.   The answers to these common questions will aid the resolution of the Class Members' common claims.

356.   These common legal and factual questions that predominate include, but are not limited to, the following:

- Whether the Named Defendants incited the riot outside the Synagogue;

- Whether the rioters (including Does #1-100) interfered with the Class Members' entrance into the Synagogue;

- Whether the rioters (including Does #1-100) attempted to interfere with the Class Members' entrance into the Synagogue;

- Whether the rioters (including Does #1-100) physically obstructed individuals' ability to enter and exit the Synagogue by either rendering ingress and egress impassable or rendering such passage in and out of the Synagogue unreasonably difficult or hazardous;

66

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

- Whether the Named Defendants' collective act of incitement violated the FACE Act;

- Whether the rioters (including Does #1-100) violated the FACE Act.

357. In short, Class Members' claims depend upon . . . common contention that the Defendants transgressed each of the Class Members' rights under the FACE Act.

358. Those "common contention[s]," moreover, are "of such a nature that" they are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve . . . issue[s] that [are] central to the validity of each one of the claims in one stroke." *Id.*

359. Named Defendants' and Does #1-100's common actions—incitement and mob violence—caused an identical injury to each of the Class Members (FACE Act)

360. Class Members will continue to suffer emotional harm and monetary damage because of Defendants' and Does #1-100's unlawful and wrongful conduct, which was directed toward Class Members as a whole, rather than specifically or uniquely against any individual Class Member.

361. Named Defendants acted in a concerted manner with respect to Class Members when they incited a mob to block access to the Synagogue.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

362.   Does #1-100 acted in a concerted manner with respect to Class Members by forming a mob that blocked access to the Synagogue on June 23, 2024.

363.   Without a class action, Class Members would likely find the cost of litigating their claims prohibitively expensive and would thus have no effective remedy at law.

364.   Class Members would then be left to incur damages and harms at the expense of Named Defendants and Does #1-100, which would effectively immunize the behavior of Named Defendants and Does #1-100.

**Typicality**

365.   The claims of Plaintiff Helmann are typical of the claims of the Class in that Plaintiff Helmann, like all Class Members, tried to enter the Synagogue on June 23, 2024, but had his attempt interfered with by the riot perpetuated by Does #1-100 and incited by the Named Defendants.

366.   Plaintiff Helmann has suffered harm identical to those of the rest of the Class (i.e., a FACE Act violation), which was caused by Defendants.

367.   Moreover, the factual bases of Named Defendants' and Does #1-100's misconduct are common to all Class Members, including Plaintiff Helmann, and represent a common thread of misconduct resulting in injury identical to all Class Members—namely, a violation of the FACE Act.

68

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

1

## Adequate Representation

2

368.  Plaintiff Helmann is a resident of Los Angeles, California, and he will

3

4

fairly and adequately represent and protect the interests of the Class.

5

369.  Plaintiff Helmann has retained counsel with substantial experience in

6

complex litigation, including class actions, as well as actions involving combating

7

antisemitism across the Country.

8

9

370.  Plaintiff Helmann and his counsel are committed to vigorously

10

prosecuting this action on behalf of the Class and have the financial resources to do

11

so.

12

13

371.  Neither Plaintiff Helmann nor his counsel have interests adverse to

14

those of the Class.

15

## Rule 23(b) Requirements

16

17

372.  As noted above, "questions of law or fact common to class members

18

predominate over any questions affecting only individual members, and . . . a class

19

20

action is superior to other available methods for fairly and efficiently adjudicating

21

the controversy." Fed. R. Civ. P. 23(b)(3).

22

373.  A class action suit will conserve the Court's resources and the resources

23

of the litigating parties.

24

25

26

27

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

28

374.   A class action will also promote consistency and efficiency of adjudication by providing common answers to the common questions of conduct and damages that predominate in this action.

375.   Class treatment is also manageable.

376.   Plaintiff Helmann is aware of no management difficulties that would preclude class certification in this case.

377.   Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Named Defendants and Does #1-100 have acted on grounds that apply generally to the Class.

378.   Further, inconsistent adjudications with respect to Named Defendants' and Does #1-100's liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests.

379.   Class-wide relief and Court supervision under Rule 23 assure fair, consistent, and equitable treatment and protection of all Class Members and uniformity and consistency in Named Defendants' and Does #1-100's future conduct.

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

1
2
3
4

## CAUSE OF ACTION
### Threatening and Intimidating Persons
### in Violation of 18 U.S.C. § 248(a)(2)
### (Plaintiff Helmann and Class Members v.
### Named Defendants and Does #1-100)

5
6

380.   Plaintiff Helmann and Class Members repeat, reallege, and incorporate by reference the allegations set forth in Paragraphs 1 through 375 of this Complaint.

7
8
9

381.   Plaintiff Helmann brings this Count on behalf of himself and the Class against Named Defendants and Does #1-100.

10
11
12
13
14
15
16

382.   The FACE Act imposes civil and criminal penalties on any person who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with . . . any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

17
18
19
20
21
22

383.   The FACE Act also imposes civil and criminal penalties on any person who "by force or threat of force or by physical obstruction . . . *attempts* to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." *Id.* (emphasis added).

23
24
25

384.   The FACE Act permits an action to be brought "by [any] person lawfully exercising or seeking to exercise the First Amendment right of religious

26
27
28

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

freedom at a place of religious worship or by the entity that owns or operates such place of religious worship." *Id.* § 248(c)(1)(A).

385.   The Synagogue is a place of religious worship for purposes of the FACE Act. *Id.* § 248(a)(2).

386.   All the events taking place at the Synagogue on June 23, 2024, involved the "exercise [of] the First Amendment right of religious freedom at a place of religious worship." *Id.*

387.   On June 23, 2024, Plaintiff Helmann and Proposed Class Members were "seeking to exercise the First Amendment right of religious freedom at a place of religious worship," namely the Synagogue, but members of Named Defendants and Does #1-100 either forcefully prevented them from doing so or attempted to forcefully prevent them from doing so. *See id.*

388.   Named Defendants and Does #1-100 by force, threat of force, or physical obstruction intentionally injured, intimidated, interfered with, and attempted to injure, intimidate, and interfere with the worship services being held at the Synagogue on June 23, 2024.

389.   Named Defendants and Does #1-100 helped to plan, organize, advertise, and (on information and belief) fund the violent mob that threatened and

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

intimidated the individuals lawfully exercising or seeking to exercise their First Amendment right of religious freedom at the Synagogue.

390.    The mob organized by Named Defendants and participated in by Does #1-100 also employed tactics to prevent Plaintiff Helmann and Proposed Class Members from exercising their First Amendment right of religious freedom at the Synagogue.

391.    Members of Named Defendants and Does #1-100 participated in the violence that prevented Plaintiff Helmann Proposed Class Members from accessing the Synagogue.

392.    Other rioters were encouraged by Named Defendants and Does #1-100 to take part in the violence that prevented Plaintiff Helmann and Proposed Class Members from accessing the Synagogue.

393.    Media reports and footage detailed the scenes of blood on the streets, the use of bear spray, and the brandishing of other weapons, including a spiked post.[102]

_____

[102] Summer Lin et al., *More Details Emerge On Protest Outside L.A. Synagogue*, Yahoo! News (June 27, 2024, 6:00 AM), https://au.news.yahoo.com/very-traumatic-medic-describes-things-100038626.html; CODEPINK Southeast Los Angeles Chapter (@codepinksela), Instagram, https://www.instagram.com/reel/C8khglxyMw4/?utm_source=ig_web_copy_link&igsh=MzRlO DBiNWFlZA== (last visited July 3, 2024); Person with spiked post arrested in clash outside Los Angeles synagogue." NBC Los Angeles, 24 June 2024, https://www.nbclosangeles.com/news/local/arrest-la-synagogue-protest-israelpalestine/3443019/

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

394.   Named Defendants' and Does #1-100's actions violated the FACE Act.

395.   Named Defendants' and Does #1-100's actions harmed Plaintiff Helmann and Class Members.

396.   The actions undertaken by Named Defendants and Does #1-100 were so reprehensible that they justify imposition of punitive damages.

397.   On behalf of himself and the Class, Plaintiff Helmann seeks compensatory damages, statutory damages, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, punitive damages, and the costs of this suit and reasonable fees for attorneys and expert witnesses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Helmann, on behalf of the Class Members, respectfully request that this Court enter judgment in their favor and against Defendants and Does #1-100, as follows:

A.     Enter judgment against Named Defendants and Does #1-100, jointly and severally, for compensatory damages or statutory damages, under the FACE Act (Count I);

B.     Enter judgment against Named Defendants and Does #1-100, jointly and severally, for punitive damages, under the FACE Act (Count I);

---

(last accessed July 7, 2024).

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

C.    Award Plaintiff Helmann and Class Members their reasonable costs and expenses, including attorney fees, incurred in this action as authorized by 18 U.S.C. § 248(c)(1)(B) (Count I);

D.    Enjoin Named Defendants, Named Defendants' members, and Does #1-100 from going within three-hundred feet of Adas Torah, under the FACE Act (Count I);

E.    Enjoin Named Defendants and Named Defendants' members from going within three-hundred feet of Adas Torah, under 42 U.S.C. § 1985 (Count II); and

F.    Award such other relief as the Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Helmann and Class Members respectfully demand a trial by jury of all issues triable by jury.

Respectfully submitted this 27th day of June 2025.

JAVITCH LAW OFFICE


*/s/ Mark L. Javitch*
MARK L. JAVITCH
Attorney for Plaintiff and Class Members


75

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on June 27, 2025, a true copy of the THIRD AMENDED CLASS ACTION COMPLAINT was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Mark L. Javitch*
MARK L. JAVITCH

76

THIRD AMENDED COMPLAINT
CASE NO. 2:24CV5704