Mark L. Javitch (CA SBN 323729)
Javitch Law Office
3 East 3rd Ave. Ste. 200
San Mateo, CA 94401
Telephone: 650-781-8000
Facsimile: 650-648-0705
mark@javitchlawoffice.com

*Attorney for Plaintiff*
And those similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RONEN HELMANN, individually, and on behalf of all others similarly situated,

Plaintiff,

v.

CODEPINK WOMEN FOR PEACE, a California entity, CODEPINK ACTION FUND, a California entity, COURTNEY LENNA SCHIRF, and REMO IBRAHIM, d/b/a PALESTINIAN YOUTH MOVEMENT, PALESTINIAN YOUTH MOVEMENT, and JOHN AND JANE DOES 1-20,

Defendants.

Case No.: 2:24-cv-05704-SVW-PVC

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTIONS TO DISMISS AND STRIKE FILED BY PALESTINIAN YOUTH MOVEMENT, REMO IBRAHIM, AND COURTNEY LENNA SHIRF**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. PYM's Post is a True Threat Not Protected by the First Amendment ..... 2

B. Defendants Call Jewish Congregants Racist, Criminals, Settlers, and Land Thieves Based on their Grievances Against Israel ..... 4

C. PYM Deploys the Most Inflammatory Symbolism and Rhetoric in Today's Social Justice Lexicon to Target Jews With Semi-Coded Threats ..... 5

D. PYM Calls for Supporters to Appear at the Entrance to the Synagogue to Prevent the "Illegal War Crimes" from Occurring ..... 8

E. Predictably, Defendants Caused Violence and Actual Fear to Plaintiff ..... 8

F. A Third Potentially Violent Group Appears to Protect the Synagogue Attendees ..... 9

G. Defendants Know that Violence is Likely Because Defendants' Targets Have a History of Suffering Threats, Violence, and Cancellations ..... 10

H. PYM Affirms Violent Protests and Has Capability to Repeat Arbitrary Attacks ..... 12

I. Synagogue Real Estate Events Are Frequent and Defendants Are Likely to Launch Attacks to Disrupt Future Events ..... 13

J. The Complaint Adequately Alleges Intent to Interfere with Religious Freedom ..... 14

K. Defendants' International Law Arguments Are Irrelevant ..... 15

L. Plaintiff Has Article III Standing ..... 16

M. Defendants' Motion to Strike Should Be Denied ..... 17

III. CONCLUSION ..... 17

## TABLE OF AUTHORITIES

**Cases**

*Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2007)....................2

*Kristensen v. Credit Payment Servs., Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018)....................16

*Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011)....................17

*Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002)....................2, 3

*United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011)....................2

*United States v. Gordon*, 974 F2d 1110, 1117 (9th Cir 1992)....................2

*United States v. Hart*, 212 F.3d 1067 (8th Cir. 2000)....................6

*United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)....................2

*Virginia v. Black*, 538 U. S. 343, 360 (2003)....................3

**Statutes**

18 U.S.C. § 248....................1, 14

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Palestinian Youth Movement (PYM), Courtney Schirf, and Remo Ibrahim ("Defendants") move to dismiss under Rules 12(b)(1) and 12(b)(6). But Plaintiffs plausibly allege a violation of the Freedom of Access to Clinic Entrances (FACE) Act, 18 U.S.C. § 248, by pleading that Defendants incited and directed conduct that used threats, force, and obstruction to interfere with Jewish congregants' exercise of religion. Defendants' post caused violence and is outside the protection of the First Amendment. The Court previously denied Code Pink's motion to dismiss and granted in part and denied in part the other Defendants' motion to dismiss without prejudice. Dkt. 108 ("Order") On June 27, 2025, Plaintiff filed the Third Amended Class Action Complaint ("TAC") alleging PYM's post in full context and its history of planning similar events that have caused violence. On July 21, 2025, Defendants moved to dismiss. Dkt. 112.

### II. ARGUMENT

Defendants' motions to dismiss and motion to strike should be denied. The Court already determined that Plaintiff has standing and Plaintiff's injuries are fairly redressable. Dkt. 108 ("Order"). The Court has already determined that it has jurisdiction over Defendants PYM, Schirf, and Ibrahim and that Plaintiffs state a claim under the FACE Act. "It was certainly foreseeable that the Organizing Defendants' social media posts would lead to a disruptive riot at the synagogue—that was their goal." *Id*. at p. 14.

Accordingly, the primary issue is now whether in context, PYM's post constitutes a true threat to Plaintiff and the putative class. The full record shows that it does.

### A. PYM's Post is a True Threat Not Protected by the First Amendment

The objective test asks whether "a reasonable person would foresee that the statement would be interpreted by those to whom he communicates the statement as a serious expression of intent to harm or assault." *Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2007). This test requires the fact-finder to "'look[] at the entire factual context of [the] statements including: the surrounding events, the listeners' reaction, and whether the words are conditional.'" *United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011) (citing *United States v. Gordon*, 974 F.2d 1110, 1117 (9th Cir 1992)) (alterations in original).

In determining whether speech is a true threat, we consider "the surrounding events and reaction of the listeners." *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002) (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)).

On the surface, PYM's post might appear to be a protected political protest. Criticizing Israeli policy by labeling its conduct "land theft" and organizing a protest to express that viewpoint is activity that squarely falls within First Amendment activity.

However, whether a post contains some First Amendment activity does not determine whether it is a true threat. A statement that does not explicitly threaten violence may be a true threat where a speaker makes a statement against a known

background of targeted violence. *See Virginia v. Black*, 538 U. S. 343, 360 (2003) (because of its history as a white-supremacist symbol, burning a cross is "often" a true threat); *Planned Parenthood*, 290 F.3d at 1085-86 ("Wanted" posters targeting doctors who performed abortions were true threats because both the speakers and the audience knew that the doctors in prior "Wanted" posters had been murdered).

Like the GUILTY posters in *Planned Parenthood*, PYM's post: (1) singled out a specific, known target and told supporters exactly when/where to converge; (2) was disseminated against a backdrop of prior violence and blockades that PYM knew would magnify the intimidating message; (3) resulted in violence; (4) was published with the intent (and the reasonable foreseeability) that congregants would understand it as a serious expression that harm or obstruction would follow, and it was (5) predictable because protests at synagogues have a history of leading to violence. TAC. ¶¶ 1–16, 49–85, 152–57, 208-219. Violence was caused not only against Plaintiff and the putative class, but also between protesters and counter-protesters. The person who controls the PYM's regional Instagram account, Mr. Ibrahim, also personally has a history of violence. *Id*. at ¶ 204. The content, timing, and context of PYM's post place it squarely outside the boundaries of protected speech.

PYM's strategy to cause violence at synagogues under the guise of purported protected activity has two major steps. The first step is defamation of the Jewish congregants seeking to attend the real estate event. PYM uses the most vile language of today's social justice movement to defame Plaintiff and the putative class. PYM's

followers are already susceptible to hatred of Israel, and the posts are meant to stir up this preexisting hatred of the Jewish state. Second, PYM calls for followers to take action by directing their hatred at certain American citizens at a certain place and time in a Los Angeles neighborhood.

### B. Defendants Call Jewish Congregants Racist, Criminals, Settlers, and Land Thieves Based on their Grievances Against Israel

First, PYM falsely blames Plaintiff and the putative class for the actions of the Israeli government. PYM directs its anger against Plaintiff and the putative class, synagogue worshippers, but Defendants' actual grievances are against the Israeli government, something attendees of the local synagogue do not control. Specifically, the post declares:

> OUR LAND IS NOT FOR SALE. STAND AGAINST SETTLER EXPANSION AT SUNDAY'S REAL ESTATE EVENT SELLING HOMES TO BUILD 'ANGLO NEIGHBORHOODS' IN PALESTINE.
> The Nakba is ongoing and must be confronted!
> FROM THE BELLY OF THE BEAST. NO JUSTICE, NO PEACE.

TAC ¶¶ 152–157.

Of course, contrary to Defendants' inflammatory characterization, this event involved nothing more than American citizens exercising their constitutional rights by meeting at a synagogue. Real estate transactions in Israel are of interest to Jewish people because of the Biblical commandment to perform Aliyah and move to Israel. TAC ¶¶ 128-134. Events concerning Aliyah and Israeli real estate are commonplace, especially because there are too many Israeli residential real estate agents. *Id.* at ¶¶ 135-138. The number of real estate agents in Israel has doubled over the last 15 years. *Id.* at 136.

If the event at Adas Torah synagogue were illegal, Defendants could have complained to the police, who would have shut it down—they did not, further showing its legitimacy. TAC ¶¶ 182–186. But Defendants accuse the synagogue attendees of being war criminals anyway as a tactic to rile up their supporters. Defendants entirely ignored that the event was legal when they instructed their followers that it was possible to "stop a war crime" by physically appearing at the synagogue entrance.

### C. PYM Deploys the Most Inflammatory Symbolism and Rhetoric in Today's Social Justice Lexicon to Target Jews With Semi-Coded Threats

PYM's post features a red overlay against a picture of purportedly illegal Israeli settlements, designed to stir passion and invoke the symbol of the October 7, 2023 Hamas terrorist attack on Israel. PYM collaborates with groups that support Hamas. *Id*. at ¶ 46.

Besides the October 7 symbolism, PYM's post employs several of the most inflammatory terms in the semi-coded social justice vocabulary. These terms are cynically selected, and used in conjunction with one another, to stir up the maximum hatred against the targeted Jews, by calling them racist, settlers, land thieves, and war criminals. These derogatory terms and symbols are only used against the most hated segments of society in Defendants' social justice theology. These terms are designed to and do provoke a reaction in their listeners.

Inciting hatred of Plaintiff and the putative class for their attendance at a Jewish event using the most inflammatory social justice terminology is no different from the semi-coded language used to inspire anti-abortion activists to murder abortion doctors.

The issue is whether the language has a history of triggering violent reactions from its listeners. *See Planned Parenthood*, 290 F.3d at 1064 (the poster states that he "kills children at designated locations"). There is no doubt that PYM knows how to provoke violent reactions among their followers.

When used in the past, they had caused violence (*Id.* at ¶¶ 210, 213-214) and they were likely to do so in the future (*Id.* at ¶¶ 217-219). *See, e.g. Planned Parenthood*, 290 F.3d at 1078-79 (history can give meaning to the medium); *United States v. Hart*, 212 F.3d 1067 (8th Cir. 2000)) (The Ryder truck was intimidating because a Ryder truck had been used in the Oklahoma City bombing. Thus, the use of the Ryder truck was a true threat). It is not required that "the maker of the threat personally cause physical harm to the listener." *Id.* at 1071.

PYM's use of the term "Settler" deploys one of the most morally charged terms in contemporary social justice discourse. Within that framework, "settler colonialism" does not merely denote occupation or control of land; it connotes racist violence, genocide, and the illegitimacy of a people's presence on the land they inhabit. It evokes comparisons to the most reviled historical atrocities—European conquest of Native American lands, South African apartheid, and other systems of violent oppression.

PYM's post seizes on the word "Anglo" from the event advertisement and falsely recasts it as evidence of racism and settler colonialism. In modern social justice discourse, accusations of racism are among the most explosive and morally damning charges that can be made, particularly when framed in terms of white supremacy or

colonial expansion. PYM deliberately weaponizes this rhetoric by suggesting that the promotion of "Anglo neighborhoods" in Israel is part of a racially discriminatory project.

But this interpretation is blatantly dishonest. In both Israeli and Jewish diaspora communities, the term "Anglo" is a widely understood shorthand for English-speaking neighborhoods—areas designed to accommodate the practical needs of immigrants and visitors from English-speaking countries such as the United States, United Kingdom, Canada, South Africa, and Australia. It has no racial connotation, nor does it imply exclusion or supremacy. It simply reflects linguistic and cultural accessibility for a global Jewish population.

Finally, the post criminalizes Jewish congregants by declaring them war criminals, despite presenting no evidence that anyone attending the synagogue committed any crime TAC ¶¶ 166–168.

PYM's post is not designed to peacefully critique Israeli government policy, but to falsely project the full moral blame for those alleged crimes onto individual Jewish civilians, and to take action—including against American Jews peacefully attending a real estate and religious event at their synagogue. The explicit aim is to inflame passions, to incite moral outrage, and to redirect anger and hostility toward ordinary Jews, under the theory that they are collectively responsible for Israel's actions. This is classic antisemitism in modern form: blaming Jews for the policies of the Israeli state, and treating them as agents of oppression merely for being Jewish and participating in a lawful, religiously motivated event. The TAC catalogs PYM and Code Pink's repeated

use of unlawful blockades, arrests, and even assaults at protests. *Id.* at ¶¶ 49–85. This pattern of using a social justice call to action mirrors the "Ryder truck" symbolism in *Hart*: PYM knows that when it posts a mobilization call, violence and obstruction predictably follow. *See Hart*, 212 F.3d at 1073 ("conduct violated the statute because of the particular manner and context in which he parked the trucks…recognizing that an act of expression can constitute a threat if intended to threaten acts of violence … or intended to cause [individuals] … to reasonably fear the use of imminent force or violence"); *Id.* at 1072 (the allusion to the "well-known events of the Oklahoma City bombing, were reasonably interpreted by clinic staff and police officers as a threat to injure").

**D. PYM Calls for Supporters to Appear at the Entrance to the Synagogue to Prevent the "Illegal War Crimes" from Occurring**

After stirring up hatred against Jews for their alleged crimes, racism, settler colonialism, and land theft, the post instructs followers *to appear at the exact location* (the front entrance of Adas Torah Synagogue, 9040 W. Pico Blvd.) *and moment* ("12 PM SHARP") when congregants are also planning to be at the synagogue entrance. The post's specificity of time and location is designed to maximize conflict and confrontation. TAC ¶¶ 152–156, 175.

**E. Predictably, Defendants Caused Violence and Actual Fear to Plaintiff**

Defendants' own brief concedes unknown persons used bear spray and assaulted people. Bear spray assaults and intimidation outside the synagogue. TAC. ¶¶ 1–8, 11–16. Physical obstruction rendering access "unreasonably difficult or hazardous." *Id.* at ¶¶ 23–24, 242-263. Plaintiff and the putative class had an actual fear for their physical safety

and could not enter the synagogue. *Id.* at ¶¶ 15, 178, 252. *See Planned Parenthood*, 290 F.3d at 1075-79 (speech which, "in context, placed the doctors in fear for their personal safety" and "effectively impeded" their access to provide services was the very intimidation the FACE Act forbids, even though the speakers did not themselves carry out the violence); *accord Hart*, 212 F.3d at 1071-72 (contextual symbols that foreseeably "created fear and disrupted normal activities" constituted a true threat under FACE).

### F. A Third Potentially Violent Group Appears to Protect the Synagogue Attendees

Besides the attendees and the protestors, Defendants' post foreseeably and intentionally riles up *a third group of people*, who otherwise would not be present—counter-protesters who often attend such events to defend the Jewish community. Violence from this third group is foreseeable and Defendants must be held liable for their post that instigated the third group. Organizers may be liable when their call-to-action foreseeably draws third parties whose clash with counter-protesters produces violence or obstruction. *Planned Parenthood*, 290 F.3d at 1075-79.

These reactive groups, too, increase the likelihood of physical altercations. For instance, Betar US, a right-wing pro-Israel group that urges its followers to "fight back" against anti-Israel protesters, counterprotested at the event. "We cannot guarantee the

safety of those who threaten Jewish synagogues," it posted on social media following the event."[1]

This third group has also been involved in violence. For example, an Indian Muslim man was attacked while participating in the pro-Palestinian rally near Congregation Ohr Torah in West Orange on Nov. 13, 2024. TAC ¶ 219. The protester required multiple stitches after he was pepper-sprayed and bashed in the head with a metal flashlight by a counter-protester. *Id.*

### G. Defendants Know that Violence is Likely Because Defendants' Targets Have a History of Suffering Threats, Violence, Cancellations, and Overwhelming Local Police

Mr. Ibrahim also has a history of violence related to his activism. Mr. Ibrahim was arrested for violent conduct while participating at an encampment at University of Southern California. *Id.* at ¶¶ 204-205. The arrest was for misdemeanor battery against a school employee (Cal. Pen. Code § 243.6). *Id.* at ¶ 206. Ibrahim knew, or reasonably should have known, that violence would be the result of the riot, given that he was arrested for a violent act that occurred at a similar riot just weeks before Adas Torah. *Id.* at ¶ 207.

The history of directing protesters to synagogues to find people in America to blame for the actions of Israel demonstrates they have a high likelihood of causing

---

[1] TAC at ¶ 218; "Brawls Break Out Surrounding Pro-Palestinian Protest in Heavily Jewish Neighborhood of Borough Park." The Jewish Chronicle (Times of Israel), 19 Feb. 2025, jewishchronicle.timesofisrael.com/brawls-break-out-surrounding-pro-palestinian-protest-in-heavily-jewish-neighborhood-of-borough-park/. Accessed 27 June 2025.

violence. Mr. Ibrahim learned how to plan the synagogue protest in Los Angeles from Richard Siegel, who has planned similar protests in Teaneck, New Jersey. Siegel's synagogue protests have also caused violence. *Id.* at ¶¶ 208-210.

This chart summarizes the violent outcomes of instigating such "protests" and/or the cancellations and venue changes resulting from threats.

| Date | Location | Event Type | Description | Citation |
|---|---|---|---|---|
| March 2024 | Khal Bnei Avrohom Yaako Synagogue in Flatbush, NY | Israeli Real Estate | Event Cancelled Due to Security Concerns | [2] |
| March 2024 | Keter Torah, Orthodox Synagogue Teaneck, NJ | Israeli Real Estate | sprayed cars with paint, hurled objects at commuters, and two were arrested. | ¶ 210 |
| May 2024 | Dallas, TX | Israel Summit | Threats from PYM forced venue to be moved twice. | ¶ 214 |
| July 14, 2024 | Congregation Charm Circle Synagogue, Queens, NY | Israeli Real Estate | Protesters attacked synagogue, shoving with counter-protesters, despite venue had been changed | ¶ 215 |
| February 2025 | Borough Park, NY | Israeli Real Estate | Violent clashes broke out in the street as police tried to separate the brawlers. One charged with third-degree assault | ¶ 218 |
| April 2024 | Congregation Bnai Yeshurun Synagogue Teaneck, NJ | Fundraiser for Israeli search-and-rescue organization | Synagogues targeted for holding unrelated events like Israeli search and rescue fundraisers. Arrest | ¶ 216 |

[2] https://www.jta.org/2024/03/13/ny/israeli-real-estate-tour-that-drew-protests-in-nj-and-canada-spikes-brooklyn-stop-over-security-concerns Accessed 23 July 2025.

| | | | | |
|---|---|---|---|---|
| | | | for bias intimidation and simple assault. | |
| Undated | Teaneck, NJ | | Rich Siegel's protests against synagogue events in Teaneck resulted in violence. | ¶¶ 208–209 |

In addition to PYM's synagogue protests, PYM's general protests also have a history of intentionally blocking traffic, causing false imprisonment (Id. at ¶ 212) and violence (*Id.* at ¶ 213). History indicates Plaintiff is reasonable to fear violence. *See Hart*, 212 F.3d at 1071 (considering "whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence."); *Planned Parenthood*, 290 F.3d at 1063 (continuing to post a series of "WANTED" and "unWANTED" posters was a true threat after the previously identified doctors on the posters were murdered.)

### H. PYM Affirms Violent Protests and Has the Capability to Repeat Arbitrary Attacks

Defendants' post after the riot and Ibrahim's interview indicate they approve of the violence while protesting outside synagogues and intend to take similar action in the future. Ibrahim gave an interview after the attack, where he proudly stated: "This real estate event was advertised for weeks, the LA community was outraged, and we showed up, because we show up to confront Zionism and white supremacy wherever it manifests, that's the bottom line." *Id.* at ¶ 336. PYM (controlled by Shirf) posted on social media on June 24, 2024, saying "We will not back down: no institution complicit in colonization and genocide gets a pass. Across North America, we have a role to play in the

dismantling of Zionism, its genocidal war machine, and its political institutions wherever they manifest. The selling of stolen Palestinian land in North American cities will not go unchallenged, no matter where the events take place. We can and will continue to confront any institution that seeks to promote, celebrate, or aid the Zionist settler project in our own backyards." These acts constitute affirmance and ratification of the tactics causing violence described herein.

### I. Synagogue Real Estate Events Are Frequent and Defendants Are Likely to Launch Attacks to Disrupt Future Events

It is apparent from their posts before and after the riot that Defendants were aware that their tactics were causing violence and they approved of what happened and pledged to do it again. The transparent goal is to disrupt Jews from exercising their constitutional rights under the guise of misrepresenting a common real estate event. The phrase "must be confronted," is an unmistakable call to physically disrupt the event. TAC ¶¶ 152–177.

PYM's post clearly incites illegal conduct – far greater violence has ensued than is necessary to state a claim under the Face Act. PYM made no effort to inform police or ask a court to determine that Plaintiff and the putative class were going to do anything illegal. If there was something illegal going on, PYM could have obtained a court order. PYM made no effort to obtain a permit or plan a lawful gathering. Instead, it deliberately incited unpermitted action that blocked worshippers from entering. TAC ¶¶ 143–147, 175–176.

The threat to Plaintiff and the putative class is clear: cancel this event, or PYM will terrorize those who try to attend. The protest was arbitrary because it was a common

synagogue event involving Jews and Israel. This demonstrates PYM's ability and intent to arbitrarily escalate against peaceful Jewish events at the time and place of its choosing TAC ¶¶ 135–140.

Defendants cross the line into unlawful incitement that constitutes a true threat, squarely within the scope of conduct Congress sought to prevent through the FACE Act, 18 U.S.C. § 248.

### J. The Complaint Adequately Alleges Intent to Interfere with Religious Freedom

Defendants argue they could not have intended to interfere with religious freedom because the real estate advertisement did not mention religion. This argument fails on multiple levels.

First, defendants targeted a synagogue—a building whose religious purpose is obvious. The complaint alleges defendants specifically chose to protest at "9040 W Pico Blvd. Los Angeles," which they knew was Adas Torah Synagogue. TAC ¶¶ 147-148. Courts have consistently held that targeting places of worship establishes the religious motivation required under the FACE Act.

Second, defendants did not even look up what events were taking place at the synagogue. The protests coincide with regularly scheduled religious services. The synagogue "host[s] at least three daily communal prayer meetings" and that "thirty to forty people, including some Proposed Class Members, regularly attend the Synagogue's daily mincha minyan, which typically occurs at approximately 1:30 PM." TAC ¶¶ 103, 124.

Third, the "Aliyah Event" itself was inherently religious. The complaint extensively details how Aliyah represents “a religious commandment—a mitzvah—to buy land in Israel and to dwell there” and that “the religious commandment to make Aliyah...is equivalent to all of the other commandments in the Torah.” TAC ¶¶ 113-114. Defendants cannot claim ignorance of the religious nature of an event specifically designed to help Jews fulfill this fundamental religious obligation. Plaintiff specifically pled that protestors blocked access, yelled antisemitic slurs, and possessed weapons. TAC at ¶¶ 7, 11, 14–16, 242-263. That is sufficient to plead obstruction.

**K. Defendants’ International Law Arguments Are Irrelevant**

Defendants’ lengthy discussion of international law and war crimes underscores the gravity of the threats facing Plaintiff and the putative class because Defendants actually believe they have a right to engage in self-help to redress an imagined crime based on irrelevant foreign policy theories, even if it causes violence. It is a transparent attempt to transform this civil rights case into a political debate about Middle Eastern policy. These arguments are legally frivolous for several reasons.

First, this case involves domestic conduct—the obstruction of an American synagogue by American defendants. The Court's jurisdiction derives from Congress's power to protect civil rights, not from any international law considerations.

Second, the legality of Israeli settlements is irrelevant to whether defendants violated the FACE Act by obstructing religious services in Los Angeles. Even if

defendants sincerely believed the real estate event violated international law, that belief does not justify violating federal civil rights statutes.

Third, defendants' argument that the Court lacks jurisdiction to "shield war crimes" mischaracterizes both the relief sought and the Court's role. Plaintiff seeks protection of fundamental constitutional rights, not any ruling on international law issues.

**L. Plaintiff Has Article III Standing**

Defendants argue that Plaintiffs lack Article III standing under Rule 12(b)(1) because the injuries alleged are not "fairly traceable" to their conduct but to third parties (the unidentified Doe "rioters").

This argument fails. Unlike in the cases cited by Defendants, where speculative chains of causation involved far-removed third-party conduct, here the TAC pleads that Defendants incited, coordinated, and directed the obstructive and violent conduct. See TAC at ¶¶ 3–14, 27–48, 84–85. Social media posts by PYM, Schirf and Ibrahim promoted the exact time and place of the protest, while PYM affiliates were physically present at the scene. *Id*. at ¶¶ 152–157. In case there was any doubt, Defendants also ratified the conduct.

These allegations are not too attenuated as a matter of law. In *Kristensen v. Credit Payment Servs., Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018), the Ninth Circuit upheld standing where the injury could be plausibly traced to intermediary conduct under a theory of agency or ratification. Similarly, Plaintiffs here allege that Defendants encouraged the unlawful acts, knew they occurred, and ratified them after the fact by

posting approving messages. TAC at ¶¶ 157–159, 284–289. The causation requirement at the pleading stage is not onerous. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) ("general factual allegations of injury resulting from the defendant's conduct may suffice"). The TAC satisfies that standard.

### M. Defendants' Motion to Strike Should Be Denied

Defendants seek to strike numerous paragraphs that establish crucial context for their campaign of intimidation. However, these allegations are not scandalous, but rather, demonstrate Defendants' pattern of organizing violent confrontations and their use of historically antisemitic rhetoric to inflame passions.

The allegations regarding PYM's support for terrorist organizations and celebration of October 7 attacks are directly relevant to showing defendants' intent and the threatening nature of their communications. Similarly, the detailed allegations about Defendants' history of violent protests establish the context necessary to understand their social media posts as true threats rather than protected speech.

## III. CONCLUSION

For the foregoing reasons, the motions to dismiss and strike filed by PYM, Schirf and Ibrahim should be denied.

Dated: July 23, 2025 Respectfully submitted

By: /s/ Mark L. Javitch

Mark L. Javitch (SBN 323729)
JAVITCH LAW OFFICE
3 East 3rd Ave. Ste. 200
San Mateo CA 94401
Tel: (650) 781-8000

Fax: (650) 300-0343

*Attorney for Plaintiff*
RONEN HELMANN
And all others similarly situated

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 4,761 words, which:

X complies with the word limit of L.R. 11-6.1.

___ complies with the word limit set by court order dated

Dated: July 23, 2025 *<u>/s/ Mark L. Javitch</u>*
Mark L. Javitch

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SAN MATEO

At the time of service, I was over 18 years of age. I am employed in County of San Mateo, State of California. My business address is Javitch Law Office, 3 East 3rd Ave, Ste. 200, San Mateo, California, 94401.

I declare that I served a copy of this document via the Court's Electronic Filing System to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 23, 2025 */s/ Mark L. Javitch*
Mark L. Javitch